UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| DOES 1-35; and UNKNOWN NAMED DOES 1-1000,<br><br>Plaintiffs,<br><br>v.<br><br>ADAM PAUL LAXALT, Attorney General of the State of Nevada; et al<br><br>Defendants. | Case No. 2:15-cv-01638-RFB-DJA<br><br>**ORDER** |

### I.     INTRODUCTION

Before the Court is Defendants' Motion to Alter or Amend the Court's September 30, 2021, Order Denying Defendants' Motion for Summary Judgment and Plaintiffs' Motion for Hearing. ECF Nos. 157, 162.  For the reasons stated below, the Court grants Defendants' motion and denies Plaintiffs' motion as moot. The Court alters its written analysis, explaining why it denies Defendants' qualified immunity defenses to Plaintiffs' claims for *damages*. Because Defendants did not file a motion for summary judgment on their own, the Court granted them limited leave to file motions for summary judgment on qualified immunity grounds only.  Because Defendants are not entitled to qualified immunity as to Plaintiffs' damages claims for the reasons stated herein, the case should proceed to trial, barring future settlement between the parties.

### II.    PROCEDURAL HISTORY

The Court incorporates the background section herein from its previous orders, ECF Nos. 148 and 156, and emphasizes the following:

Plaintiffs filed their original complaint on August 25, 2015. ECF No. 1. The complaint

challenges the retroactive application of movement and residency restrictions as to Plaintiffs, who are all registered sex offenders, on several constitutional grounds, including the Ex Post Facto Clause. On September 9, 2016, the Court granted Plaintiff leave to file an amended complaint and dismissed a pending motion to dismiss without prejudice. ECF No. 42.

Plaintiff filed the First Amended Complaint on October 11, 2016. ECF No. 45. Defendants Conmay, Laxalt, Wood, and Wright filed their answer on October 25, 2016. On April 23, 2018, Plaintiffs filed a Motion for Partial Summary Judgment. ECF No. 68. Defendants responded on May 14, 2018. ECF No. 70. Plaintiffs replied on May 28, 2018. ECF No. 73. On January 17, 2019, the Court denied the motions to dismiss/summary judgment and granted Plaintiffs leave to amend the complaint to add the State Board of Parole Commissioners. ECF No. 75. The Court also reopened discovery for 120 days. Id.

Plaintiff filed the operative Second Amended Complaint ("SAC") on January 28, 2019. ECF No. 76. Defendants answered the SAC on March 5, 2019. ECF No. 94. A settlement conference occurred on June 25, 2019. A settlement was not reached. ECF No. 108. Plaintiffs Does 1-35 filed the instant second motion for summary judgment on September 16, 2019. ECF No. 112. A response and reply were filed. ECF Nos. 116, 118. On March 9, 2020, the Court heard oral argument on the motion. ECF No. 127. Due to the pandemic, the parties' status conference was rescheduled three times. ECF Nos. 128, 129, 130. On June 19, 2020, Defendants filed a "Motion to Consider Immunity Arguments as a Countermotion; Alternatively, Motion for Supplemental Briefing." ECF No. 134. Plaintiffs responded on July 6, 2020. ECF No. 136.

On August 4, 2020, the Court held a status conference. ECF No. 140. The Court granted Defendants' "Motion to Consider Immunity Arguments as a Countermotion" and construed it as a motion for leave to file supplemental briefing. Id. The Court ordered Defendants to file a "motion for summary judgment on qualified immunity" by August 31, 2020, and took Plaintiffs' Motion for Partial Summary Judgment under submission. Id. On August 12, 2020, the parties agreed to substitute Defendants who were sued in their official capacities.[1] ECF Nos. 141, 142.

---

[1] Anne Carpenter was substituted in her official capacity for Natalie Wood; Mindy McKay was substituted

On September 14, 2020, Defendants filed their Motion for Summary Judgment on Qualified Immunity. ECF No. 145. The Court granted Plaintiffs' Motion for Partial Summary Judgment on September 29, 2020. ECF No. 148. Defendants filed a Motion to Alter or Amend the Court's September 29, 2020 Order on October 23, 2020. ECF No. 149. Briefing for Defendants' Motion to Alter or Amend ended on November 13, 2020. Briefing for Defendants' Motion for Summary Judgment on Qualified Immunity concluded on December 9, 2020.

On September 30, 2021, the Court denied Defendants' Motion for Summary Judgment. ECF No. 156. The Court also granted in part Defendants' Motion to Alter or Amend the Court's prior order. Id. The Court vacated the injunction issued in its prior order and issued a more precise injunction. Id. The Court's September 30, 2021 Order denied qualified immunity on the basis that qualified immunity is not available for claims for declaratory and injunctive relief. Id.

On October 26, 2021, Defendants moved to alter or amend the Court's September 30, 2021 order denying its Motion for Summary Judgment. ECF No. 156. Plaintiffs responded on November 4, 2021. ECF No. 159. The Court held a status conference on the motion on November 9, 2021, acknowledging that it had erroneously overlooked Plaintiffs' claims for damages to which Defendants' immunity defenses responded, and ordered Defendants to file a Reply in support of their motion by November 12, 2021. ECF No. 160. Defendants filed their Reply on November 9, 2021. This written order follows.

### III. FACTUAL BACKGROUND

#### A. Undisputed Facts

The Court incorporates by reference the undisputed facts in its September 29, 2020 Order granting Plaintiffs' Motion for Summary Judgment (ECF No. 148) and repeats and emphasizes the following:

Plaintiffs are registered sex offenders who have completed their sentences and are now subject to lifetime supervision status. In 1995, the Nevada state legislature passed NRS 176.0931,

---

in her official capacity for Patrick J. Conmay, and Mary Baker was substituted in her official capacity for Adam Endel. Defendants Wood and Endel remained Defendants in their individual capacities only. Defendant Conmay was dismissed as he was sued only in his official capacity.

which created a system of lifetime supervision for sex offenders. Nev. Rev. Stat. § 176.0931. In conjunction with NRS 176.0931, the State of Nevada passed NRS 213.1243, which grants the State Board of Parole Commissioners ("the Board") the authority to establish a program of lifetime supervision. Nev. Rev. Stat. § 213.1243.[2]

In 2007, Nevada passed AB 579 and SB 471. The two laws amended NRS 213.1243 to impose a number of additional conditions that courts were required to impose. AB 579 related to reclassification, registration, and notification. SB 471 imposed residency and movement restrictions. The relevant provisions of SB 471 went into effect October 1, 2007. Specifically, SB 471 commands that sex offenders placed on lifetime supervision may not "knowingly be within 500 feet of any place" or reside anywhere "located within 1,000 feet of any place" that is "designed primarily for use by or for children." SB 471 §§ 8(3), (4). Of the various movement restrictions, the two most significant ones were those requiring Tier 3 offenders to live at least 500 or 1,000 feet away from areas where children could congregate.

In 2008, the Honorable James C. Mahan, United States District Judge, held that the retroactive application of both AB 579 and SB 471 was unconstitutional. Am. C.L. Union of Nevada v. Cortez Masto, 719 F. Supp. 1258, 1260 (D. Nev. 2008) ("Masto I"). The Ninth Circuit reversed the district court's finding as to AB 579 but found the issue of residency and movement restrictions under SB 471 moot in light of the State of Nevada's judicial admission that they would not retroactively impose SB 471's requirements. Am. C.L. Union of Nevada v. Cortez Masto, 670 F.3d 1046 (9th Cir. 2012) ("Masto II").

On remand, at a status conference, Plaintiffs raised the issue that they continued to be subjected to identical movement restrictions as those imposed by SB 471. Defendants responded that they were exercising their general authority under NRS 213.1243 rather than the specific

---

[2] The Board, which is led by the Parole Commissioner, is a subdivision of the Nevada Department of Public Safety, which is authorized to "execute, administer and enforce, and perform the functions and duties provided in Chapters 176A and 213 of NRS relating to parole and probation." NRS § 480.110. Within the Department of Public Safety, there is a Division of Parole and Probation, which is led by the Chief Parole and Probation Officer. However, the Parole Commissioner reports directly to the Governor, whereas the Chief Parole and Probation Officer reports to the Director of the Department of Public Safety.

restrictions outlined in SB 471 and identified other statutes that they claimed gave it the authority to impose retroactive movement and residency restrictions.[3]

Plaintiffs filed the instant action on August 25, 2015. ECF No. 1. The next year, the Nevada Supreme Court ruled that the Parole Board could not impose conditions beyond those listed in NRS 213.1243. McNeill v. State, 375 P.2d 1022 (Nev. 2016).

### B. Disputed Facts

The parties dispute the factual circumstances involving each individual Doe Plaintiff, including the enforcement actions taken against them, as well as the reasons behind these actions. The parties also dispute the date of the offenses for certain Doe Plaintiffs.

## IV. LEGAL STANDARD

### A. Motion to Alter or Amend a Judgment

Rule 59(e) allows for a motion to alter or amend a judgment within twenty-eight days after the entry of the judgment. Fed. R. Civ. P. 59(e). "Since specific grounds for a motion to alter or amend are not listed in the rule, the district court enjoys considerable discretion in granting or denying the motion." McDowell v. Caleron, 197 F.3d 1253, 1255 n.1 (9th Cir. 1999). But the relief provided for is extraordinary and "should be used sparingly." Allstate Ins. Co. v. Herron, 634 F.3d 1101, 1111 (9th Cir. 2011) (citing McDowell, 197 F.3d at 1255). The "four basic grounds upon which a Rule 59(e) motion may be granted [are]: (1) if such motion is necessary to correct manifest errors of law or fact upon which the judgment rests; (2) if such motion is necessary to present newly discovered or previously unavailable evidence; (3) if such motion is necessary to prevent manifest injustice; or (4) if the amendment is justified by an intervening change in controlling law." Id.

### B. Qualified Immunity

In deciding whether officers are entitled to qualified immunity, courts consider, taking the

---

[3] The Court notes, additionally, that Judge Mahan's injunction allowed the continued application of the movement and residency restrictions that were in in effect prior to the effective date of SB 471 but declined to determine what those were and advised Plaintiffs to file a new case relating to any arguments about the contents of such regulatory restrictions. See Am. C.L. Union of Nevada v. Masto et al, 2:08-cv-00822-JCM-PAL, ECF No. 162 at 12.

facts in the light most favorable to the nonmoving party, whether (1) the facts show that the government actor's conduct violated a statutory or constitutional right, and (2) if so, whether that right was clearly established at the time. Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). While a case directly on point is not required for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." Id. "In the absence of binding precedent, a court should look to whatever decisional law is available to ascertain whether the law is clearly established" for qualified immunity purposes. Capoeman v. Reed, 754 F.2d 1512, 1514 (9th Cir. 1985). This includes "decisions of state courts, other circuits, and district courts.'" Vaughan v. Ricketts, 859 F.2d 736, 739 (9th Cir. 1988).

Qualified immunity is an immunity from suit rather than a defense to liability, and it "ensures that officers are on notice their conduct is unlawful before being subjected to suit." Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014). Under the second prong of this inquiry, courts "consider whether a reasonable officer would have had fair notice that the action was unlawful." Id. at 1125 (brackets in original omitted). "This requires two separate determinations: (1) whether the law governing the conduct at issue was clearly established and (2) whether the facts as alleged could support a reasonable belief that the conduct in question conformed to the established law." Green v. City and County of San Francisco, 751 F.3d 1039, 1052 (9th Cir. 2014). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" Ashcroft, 563 U.S. at 741 ((brackets in original) (quoting Anderson v. Creighton, 483 U.S. 635, 640, (1987)). Further, the right must be defined at "the appropriate level of generality . . . [, and the court] must not allow an overly generalized or excessively specific construction of the right to guide [its] analysis." Cunningham v. Gates, 229 F.3d 1271, 1288 (9th Cir. 2000); see also Ashcroft, 563 U.S. at 741-42. The plaintiff bears the burden of proving that the right was clearly established. Tarabochia, 766 F.3d at 1125.

Qualified immunity also may not be relied upon if there is a genuine issue of disputed fact

between the parties as to events surrounding the suspect conduct. Sandoval v. Las Vegas Metro. Police Dep't, 756 F.3d 1154, 1160 (9th Cir. 2014).

## V.  DISCUSSION

The Court grants Defendants' motion and strikes its September 29, 2020 order as to its analysis on qualified immunity on Plaintiffs' claims for damages.

The Court ordered Defendants to file a "summary judgment motion on qualified immunity" relating to Plaintiffs' damages claims only. ECF No. 140. In their SAC, Plaintiffs bring their claim for damages against the following Defendants: Christopher Derico,[4] Susan Jackson, Adam Endel, and Tony Corda ("Board Defendants") and Natalie Wood ("Ms. Wood"). ECF No. 76. The Court's prior order incorrectly dismissed the motion on the grounds that qualified immunity is not a defense to claims for declaratory and injunctive relief.

### A. Qualified Immunity

The Court summarizes the parties' arguments and provides its reasoning for denying the remaining Defendants' Motion for Summary Judgment on qualified immunity grounds as to Plaintiffs' damages claims.

#### i.  Parties Arguments

Board Defendants argue that because the "standard policy" they enforced mirrored some but not all the requirements of SB 471, they did not commit a clear ex post facto violation that would deprive them of qualified immunity. They argue that the Board did not impose the SB 471 movement or residency restrictions as a condition of lifetime supervision. Specifically, "the Parole Board did impose standard residency approval and 'in or near' presence conditions, [but] it did not impose the 500-foot movement or 1,000-foot residency restrictions challenged in this lawsuit as a condition of lifetime supervision." ECF No. 145. Second, the Parole Board only issued the conditions of lifetime supervision but did not enforce these provisions; that was done by the Division. Because the Board did not impose the SB 471 restrictions as conditions of Lifetime Supervision, and because their imposition of "standard" movement and residency restrictions was

---

[4] The Court finds that Plaintiffs waive their arguments as to Christoper DeRicco, who was appointed to the Parole Board after the relevant enforcement period, which ended in 2016.

7

not prohibited by clearly established federal law at the time of the alleged misconduct, they argue they are entitled to qualified immunity.

### ii. Natalie Wood

Ms. Wood argues that she is entitled to qualified immunity for four main reasons. First, she asserts that she is entitled to supervisory immunity because Plaintiffs fail to show that Wood personally approved any of the divisions policies that it now challenges. Plaintiffs must show that the policy Wood advanced was so deficient that it "repudiated" their constitutional rights, see Jeffers v. Gomez, 267 F.3d 895, 914 (9th Cir. 2001), and they have failed to do so here.

Second, Ms. Wood argues she is entitled to qualified immunity related to the SB 471 movement restriction. Specifically, Ms. Wood states that enforcement of the 500-foot movement restriction—whether pursuant to SB 471 or pursuant to the "in or near" standard condition of lifetime supervision—was infrequent because "Division staff would typically become aware of a possible violation only upon receipt of a report from law enforcement or the public that an offender had entered a prohibited location." ECF No. 145 (internal citation omitted).

Third, Ms. Wood argues she is entitled to qualified immunity related to the SB 471 residency restriction. She addresses each Doe Plaintiff's particular circumstances as follows.

Ms. Wood states that Does 3, 4, 5, 9, 10, 12, 13, 15, 19, 21, 22, 23, 24, 27, 28, 31, 32, 34, and 35 admit Division staff took no action to enforce residency restrictions against them or were unable to provide any specific allegations of enforcement. As to Does 2, 20, 29, and 30, Ms. Wood argues that they all committed their crimes after October 1, 2007, and any enforcement of the SB 471 restrictions against these Plaintiffs was prospective and there was no retroactive enforcement of lifetime supervision conditions.

Defendant Wood further argues that she is entitled to qualified immunity as to Does 1, 7, and 17, all of whom allege enforcement actions that predate Defendant Wood's tenure as Chief. Doe 1 alleges that he was denied permission to move to a Reno residence in 2007 because the residence was located near a school. However, Ms. Wood states this allegation predates Defendant Wood's tenure as Chief by approximately seven years. Doe 7 alleges that officials denied his

application to move to California pursuant to an interstate compact agreement in 2010; this too predates Ms. Wood's tenure as Chief by roughly four years. Doe 17 alleges that officials denied his request to live in a certain apartment building immediately after incarceration in 2012. This predated Ms. Wood's tenure by two years.

Ms. Wood further argues that she is entitled to qualified immunity as to Does 16, 18, and 25 because the Division staff denied their requests to change residence for reasons other than the SB 471 prohibition against residing within 1,000 feet of a place designed primarily for use by children.

Doe 16 was denied a transfer to Colorado in 2017, because of Colorado officials. Doe 18 alleges he was denied permission to live with his girlfriend in 2012, 2013, and 2014, and that he was further denied permission to rent a townhome in 2015; instead, Doe 18 moved in with his girlfriend without permission in 2012 and had contact alone with his girlfriend's minor children. He was subsequently arrested for violating the conditions of lifetime supervision. Doe 25 was similarly not denied permission to live in a specific building or complex because of its proximity to an establishment frequented by children; he was denied permission to live with his girlfriend who had minor children. Because there were other rationales for denying these individuals, Ms. Wood asserts she is entitled to qualified immunity as to Does 16, 18, and 25.

Ms. Wood also argues she is entitled to qualified immunity as to residency enforcement actions alleged by Does 8 and 11. As to Doe 8, who alleges he was denied permission to move to two Las Vegas residences in January 2015, Division records indicate that he was in fact prevented from moving into a house with minor children and to a residence proximate to a middle school. Doe 11 alleges he was denied permission to move to an apartment complex in April 2015, but instead Division records show that he moved to a certain complex in 2016 and was evicted due to his status as a felon.

Finally, Ms. Wood argues that she is entitled to qualified immunity because she approved Division enforcement policies while relying on the advice of legal counsel and the policies were not contrary to clearly-established federal law or the government's prior representations regarding

SB 471 enforcement in <u>Masto I</u> or <u>Masto II</u>.

Ms. Wood asserts that Division policies were issued directly in accordance with the July 2014 clarification order issued by the district court in <u>Masto I</u>. Specifically, during the time she served as Chief, it was Ms. Wood's expectation that staff would enforce the standard conditions of lifetime supervision set by the Parole Board, including a requirement that offenders reside at a location only if approved by a Parole and Probation Officer, and a restriction prohibiting offenders from being "in or near" certain areas including playgrounds and schools. Ms. Wood states that it was the historical practice of the Division to interpret the residency approval requirements to prohibit certain sex offenders from residing within 1,000 feet of places frequented by children. Although the Division's historical interpretation of the residency approval requirement overlapped with elements of the SB 471 residency restriction—including the distance of 1,000 feet and the focus on places designed for or frequented by children—there were also substantive differences. These differences included the scope of offenders to whom the restriction applied and whether the enforcement of the restriction was discretionary or mandatory. The Court notes that Ms. Wood does not indicate when the policy was first implemented or point to any written document—either the Division's or the Parole Board's—which set this "historical standard" in place.

Ms. Wood further argues that no court has found the Division's historical interpretation of the residency approval requirement to be unlawful, and it was not until July 2016 that the Nevada Supreme Court determined the Parole Board lacked authority to impose conditions of lifetime supervision on offenders not specifically enumerated in NRS 213.1243, Nevada's lifetime supervision statute. See <u>McNeil v. State</u>, 375 P.3d 1022 (2016). Throughout the time she was employed at the Division, Ms. Wood consulted the advice of legal counsel. In those conversations, she was assured that <u>Masto I</u> and <u>Masto II</u> did not have any bearing on the Division's ability to enforce movement and residency restrictions that pre-dated SB 471's effective date.

### iii. *Plaintiffs' Arguments*

Plaintiffs make two main arguments. First, Plaintiffs argue that all Defendants foreclosed their right to make their central argument—that the movement and residency restrictions arise out

of regulations, rather than retroactive application of a statute— at appellate argument in Masto II ("Nevada's statement in this case, however, constitutes a binding judicial admission because the State went beyond a simple expression of its legal position regarding the interpretation of SB 471. The State represented, as a matter of law, that it had no authority under SB 471 to apply its movement and residency restrictions retroactively and that it will 'absolutely' not do so in the future."). Plaintiffs point out that Defendants, after representing that they would not apply SB 471 retroactively, cannot now argue in a separate proceeding that they acted this whole time pursuant to regulations pre-dating SB 471, which contain the same restrictions as SB 471. Under the law of the case doctrine, the Ninth Circuit's decision in Masto II controls here, and Defendants are estopped from arguing that they may, through regulation, do what they could not do by statute.

Second, Plaintiffs argue that Defendants cannot point to a single statutory authority giving them leave to craft policies or even "standard procedures" that go beyond the scope of NRS 213.1243. Plaintiffs argue that at the latest, in 2016, it was clearly established law that "the only restrictions that the government can impose on offenders on lifetime supervision status are those that are specifically set forth by the Legislature in Nevada Revised Statute [NRS] 213.1243." McNeill v. State, 375 P.3d 1022 (Nev. 2016). As early as 2005, the only statutory authority pursuant to which Division staff approves or denies a residency request related to sex offenders is NRS 176.410, which does not govern lifetime supervision, and instead governs sex offender cases where "the court grants probation or suspends the sentence." (emphasis added). Although Defendants attempt to conflate parole and lifetime supervision, they fail to cite any legal support for such conflation, and in fact, blatantly disregard the contrary yet controlling precedent—Palmer v. State, 59 P.3d 1192 (Nev. 2002)—where the Nevada Supreme Court clarified over twenty years ago that parole is separate and distinct from lifetime supervision. Finally, despite Defendants' shifting rationales for implementing the movement and residency restrictions based on inapplicable statutes, Ms. Wood's sworn deposition testimony states that there was no statutory basis for the same. The Board Defendants entered substantively identical signed declarations, with the exception of Christopher De Ricco, who noted that he was additionally immune because he

was appointed to the Parole Board after the relevant enforcement period.

### b. Judicial Estoppel

The Court finds that Defendants are judicially estopped from asserting qualified immunity based on a belief that they had other sources of authority (e.g., general authority, statutory authority) to impose the movement and residency restrictions at issue in this case.

Judicial estoppel "is an equitable doctrine invoked by a court at its discretion." New Hampshire v. Maine, 532 U.S. 742, 750 (2001). "Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." Casa del Caffe Vergnano S.P.A. v. Ital Flavors, LLC, 816 F.3d 1208, 1213 (9th Cir. 2016). Judicial estoppel may apply when 1) a party's later position is clearly inconsistent with an earlier position, 2) the party succeeded in persuading a court to accept a party's earlier position, and 3) the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. New Hampshire, 532 U.S. at 751.

Here, the Ninth Circuit refused to rule on the question of whether the movement and residency restrictions under SB 471 applied retroactively based on Defendants' sworn admission that they would not apply the restrictions retroactively. When finding the issue moot, the Ninth Circuit explicitly noted that, "[t]he State represented, as a matter of law, that it had no authority under SB 471 to apply its movement and residency restrictions retroactively and that it will 'absolutely' not do so in the future." Masto, 670 F.3d at 1064–65. Defendants therefore conceded any basis for retroactively applying the movement and residency restrictions contained in SB 471. Now, Defendants take an inconsistent position by insisting that the restrictions applied to Plaintiffs existed well before Masto I and Masto II and have always been enforced pursuant to other sources of authority.

Defendants will derive an unfair advantage and impose an unfair detriment on Plaintiffs if not estopped. To the extent Defendants argue that these restrictions were already in place prior to SB 471's effective date or that they were acting pursuant to a general or statutory authority

independent of SB 471, this was an argument that was available to Defendants during Masto II. The Court of Appeals could have determined whether the imposition of such conditions violated the Ex Post Facto Clause, regardless of the authority cited by Defendants. By choosing not to raise this argument, Defendants deprived Plaintiffs and the Ninth Circuit from addressing the constitutionality of Defendants' conduct years earlier. Defendants are estopped from now basing their qualified immunity argument on this supposed ambiguity or lack of clearly established law.

The Court further finds in this context that Defendants were well aware of their own "historical practices" and other sources of authority at the time of Masto II and their failure to assert this argument earlier constitutes strategic gamesmanship. Such a "reversal of position suggests the very gamesmanship that judicial estoppel seeks to avoid. Azod v. Robinson, No. 22-56186, 2024 WL 163371, at *2 (9th Cir. Jan. 16, 2024); see also Teledyne Industries, Inc. v. N.L.R.B., 911 F.2d 1214, 1218 (6th Cir. 1990). This gamesmanship is particularly insidious here, because the State's judicial admission prevented the Ninth Circuit from addressing the constitutionality of the very conditions that the State and Defendants went on to impose under allegedly different authority immediately after affirming that it would never impose such conditions. And if the Ninth Circuit had ruled against Defendants, they would not have been able to engage in the conduct here and they would not have been able to argue qualified immunity for lack of clearly established law. To avoid this, they made an admission to the federal circuit court which they now seek to circumvent. This is the very definition of strategic gamesmanship and the type of conduct meant to be addressed by a court's equitable jurisdiction in the form of estoppel.

///

///

///

### VI. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motion to alter or amend the Court's September 30, 2022 Order (ECF No. 157) is **GRANTED**. The Court **STRIKES** its prior order only as to its denial of Defendants' motion for summary judgment on qualified immunity.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment on Qualified Immunity (ECF No. 145) is **GRANTED** as to Defendant Christopher DeRicco. The motion is **DENIED** in all other respects.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Hearing (ECF No. 162) is **DENIED** without prejudice as moot.

**IT IS FURTHER ORDERED** that the parties meet and confer and establish which Plaintiffs are covered by the Court's order and are eligible to proceed in this case, based on the guidance provided at the August 4, 2020, hearing and update the Court by **April 30, 2024.**

**DATED:** March 31 2024.



**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**