**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

| | |
|---|---|
| DOES 1-35; and UNKNOWN NAMED DOES 1-1000,<br><br>Plaintiffs,<br><br>v.<br><br>ADAM PAUL LAXALT, Attorney General of the State of Nevada, *et al.*,<br><br>Defendants. | Case No. 2:15-cv-01638-RFB-DJA<br><br>**BENCH ORDER** |

This case is a § 1983 civil rights action filed by multiple plaintiffs, all of whom are convicted sex offenders subject to special sentences of lifetime supervision, in which they challenge the retroactive application of certain movement and residency restrictions that stem from Nevada Senate Bill 471. The Court held a bench trial in this case on March 10, March 11, March 12, March 13, March 14, March 24, and May 16, 2025. Based on the following findings of fact and conclusions of law, the Court awards some of the Plaintiffs damages against Defendants Natalie Wood, Adam Endel and Tony Corda.

## I. PROCEDURAL HISTORY

Plaintiffs filed the operative Second Amended Complaint ("SAC") on January 28, 2019. ECF No. 76. Defendants answered the SAC on March 5, 2019. ECF No. 94. Plaintiffs Does 1–35 filed a second motion for summary judgment on September 16, 2019. ECF No. 112. A response and reply were filed. ECF Nos. 116, 118. On March 9, 2020, the Court heard oral argument on the motion. ECF No. 127.

On June 19, 2020, Defendants filed a Motion for Supplemental Briefing to raise the issue of qualified immunity. ECF No. 134. Plaintiffs responded on July 6, 2020. ECF No. 136. On August 4, 2020, the Court held a status conference. ECF No. 140. The Court granted Defendants' Motion and ordered them to file a "motion for summary judgment on qualified immunity" by August 31, 2020. Id. The Court took Plaintiffs' Motion for Partial Summary Judgment under submission. Id. On August 12, 2020, the Parties agreed to substitute Defendants who were sued in their official capacities. ECF Nos. 141, 142. On September 14, 2020, Defendants filed their Motion for Summary Judgment on Qualified Immunity. ECF No. 145.

The Court granted Plaintiffs' Motion for Partial Summary Judgment on September 29, 2020. ECF No. 148. The Court held that the "movement and residency restrictions are both retroactive and punitive" and thus unconstitutional under the Ex Post Facto Clause. The Court then ordered that Defendants "are permanently enjoined from retroactively enforcing any condition of lifetime supervision not specifically set forth in NRS 213.1243 before October 1, 2007[,]" to any plaintiffs who met certain criteria. Id.

Defendants filed a Motion to Alter or Amend the Court's September 29, 2020, Order on October 23, 2020. ECF No. 149. The motion was briefed by November 13, 2020. ECF Nos. 151, 152. Briefing for Defendants' Motion for Summary Judgment on Qualified Immunity concluded on December 9, 2020. ECF Nos. 150, 155.

On September 30, 2021, the Court denied Defendants' Motion for Summary Judgment. ECF No. 156. The Court also granted in part Defendants' Motion to Alter or Amend the Court's Prior Order. Id. The Court vacated the injunction issued in its prior Order and issued a more precise injunction. Id. The narrower injunction set forth the following: "Defendants are permanently enjoined from enforcing any retroactive imposition of residency and movement restrictions not specifically set forth in NRS 213.1243 before October 1, 2007[,] to any plaintiffs who meet the following conditions: (1) The plaintiff's last relevant criminal offense occurred before October 1, 2007. (2) A 'relevant' criminal offense is any offense that would trigger the movement and residency restrictions of SB 471." Id. Notably while the Court vacated its prior injunction, it did not vacate its decision as to liability. Id. The Court also denied qualified immunity on the basis

that qualified immunity is not available for claims for declaratory and injunctive relief. Id. Neither of the Court's Orders, ECF Nos. 148, 156, addressed any defendant's personal involvement in the retroactive enforcement found to be unconstitutional.

On October 26, 2021, Defendants moved to alter or amend the Court's September 30, 2021, Order denying their Motion for Summary Judgment. ECF No. 156. The Motion was briefed by November 9, 2021. ECF Nos. 159, 161. The Court held a status conference on the motion on November 9, 2021, acknowledging that it had erroneously overlooked Plaintiffs' claims for damages to which Defendants' immunity defenses responded. ECF No. 160.

On March 31, 2024, the Court granted Defendants' motion to alter or amend the Court's September 30, 2022, Order and struck its prior Order as to its denial of Defendants' motion for summary judgment on qualified immunity. ECF No. 165. The Court granted Defendants' motion for summary judgment as to Defendant Christopher DeRicco but denied it in all other respects. Id. The Court found that Defendants were judicially estopped from raising qualified immunity based on a belief that they had other sources of authority (*e.g.*, general authority, statutory authority, etc.) to impose the movement and residency restrictions at issue in this case. In so doing, the Court denied all Defendants' (except Defendant DeRicco's) qualified immunity defenses to Plaintiffs' claims for damages. Id. The Court ordered the Parties to meet and confer to determine "which Plaintiffs are covered by the Court's order and are eligible to proceed" to trial on Plaintiffs' requests for damages.

On April 25, 2024, Plaintiffs filed a motion for an interim award of reasonable attorney's fees. ECF No. 166. On May 29, the Parties filed an amended status report identifying nineteen plaintiffs who they agreed were eligible for the relief outlined in the Court's prior orders. ECF No. 175. The Report further stated, "Plaintiffs also respectfully submit that Does 12, 30 and 31 are eligible because their relevant offense date range begins before October 1, 2007. Defendants dispute the eligibility of these Does because their relevant offense date range ends after October 1, 2007." Id.

On May 30, 2024, the Court held a status conference and required Plaintiffs and Defendants to file briefs regarding the disputed plaintiffs—*i.e.*, Does 12, 30, and 31. ECF No. 182. These were

filed by June 21, 2024. ECF Nos. 177, 180.

On September 11, 2024, the parties filed their Joint Pretrial Order. ECF No. 193. On January 14, 2025, the Court set the calendar call for February 18 and the trial for March 10. ECF No. 195.

Defendants filed a motion for a settlement conference and a motion to stay the case on January 28, 2025. ECF Nos. 196, 197. It was briefed by February 7. ECF Nos. 203, 205. On January 29, the Defendants filed a suggestion of death as to Plaintiff Emerson Joiner Fr. ECF No. 198. On January 30, Defendants filed a motion *in limine*. ECF No. 200. It was briefed by February 5. ECF No. 202. Plaintiffs also filed a motion *in limine*. ECF No. 201. Defendants responded on February 11. ECF No. 206. On February 13, Plaintiffs filed a motion requesting leave to file a reply, ECF No. 208, as well as the reply on February 14, ECF No. 209.

On February 18, the Court held a calendar call. The Court denied the motion for settlement conference, denied Defendants' motion *in limine*, held that Plaintiffs may only present evidence disclosed to Defendants at trial, denied Plaintiffs' motion *in limine*, held that Defendants are allowed to raise arguments related to personal participation and causation at trial, and ordered the Parties to file their exhibit and witness lists by February 25. ECF No. 216.

On March 7, Plaintiffs filed a stipulation concerning the withdrawal of exhibits as well as a motion to substitute a deceased plaintiff. ECF Nos. 217, 218. On March 9, the Court issued a minute order with the trial schedule. ECF No. 219.

On March 10, the trial began with witness Terry Green. ECF No. 220. On March 11, the Plaintiffs submitted an addendum to their exhibit list and a further amended proposed addendum to the exhibit list. ECF Nos. 221, 222. No witnesses were heard on the second day of trial. ECF No. 223. On the third day of trial, the Court heard from the following witnesses: Terry Green, Tania Scott (*a.k.a.*, Tania Gates), Joshua Crowe, Joseph Defuria, Barty Scott and Dwight Bellard. ECF No. 224. On the fourth day of trial, the Court heard from the following witnesses: Jerrod Updike; Kristian Prestholm; Frank Burns; Marco Reid; David Banuelos; Julian Grijalva; and Mario Jetton. On the fifth day of trial, the Court heard from the following witnesses: Ruben Diaz; Eddie Ridenouer; and Donald White. The Court denied the motion to substitute as moot. ECF No.

227.

The continuation of the bench trial was set for March 24. ECF No. 228. On March 24, the Court held the sixth day of the bench trial and heard from George Rosenthal, Gonzalo Ramos Lopez, and Eric Archuleta. ECF No. 231. The continuation of the bench trial was set for May 16.

On March 31, the Court entered an order: granting in part Plaintiffs' motion for attorney's fees; denying Defendants' motion to disregard in part Plaintiffs' reply; denying Defendants' motion to stay; and granting Plaintiffs' motion for leave to file a reply. ECF No. 233.

The Court held the seventh and last day of the bench trial on May 16. The Court heard from the following witnesses: John Stewart Kanipe; Natalie Wood; Adam Endel; and Tony Corda. ECF No. 244.

Having heard and reviewed the evidence, observed the credibility of the witnesses, and considered the Parties' submissions, the Court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

This case involves the retroactive application of residency and movement restrictions to convicted sex offenders on lifetime supervision, whose offense dates are prior to October 1, 2007—*i.e.*, the date said restrictions were put into effect. The Court has declared such retroactive application in violation of the Ex Post Facto clause of the United States Constitution and enjoined its application to eligible Plaintiffs. The Court now considers whether these Plaintiffs have established that they are entitled to damages against Defendants Natalie Wood, Adam Endel, and Tony Corda.

### A. SENATE BILL 471

In 1995, the Nevada state legislature passed NRS 176.0931, which created a system of lifetime supervision for sex offenders. NEV. REV. STAT. § 176.0931. In conjunction with NRS 176.0931, the State of Nevada passed NRS 213.1243, which grants the State Board of Parole Commissioners ("the Board") the authority to establish a program of lifetime supervision. NEV. REV. STAT. § 213.1243.

In 2007, Nevada passed Assembly Bill ("AB") 579 and Senate Bill ("SB") 471. The two laws amended NRS 213.1243 to impose a number of additional conditions that courts were required to impose. AB 579 related to reclassification, registration, and notification. SB 471 imposed residency and movement restrictions. Specifically, SB 471 commands that sex offenders placed on lifetime supervision may not "knowingly be within 500 feet of any place" or reside anywhere "located within 1,000 feet of any place" that is designed primarily for use by, or for, children. See SB 471 §§ 8(3), (4). The relevant provisions of SB 471 went into effect October 1, 2007.

In 2008, the Honorable James C. Mahan, United States District Judge, held that the retroactive application of both AB 579 and SB 471 was unconstitutional. See Am C.L. Union of Nev. v Cortez Masto, 719 F. Supp. 2d 1258, 1260 (D. Nev. 2008) ("Masto I"). The Ninth Circuit reversed the district court's finding as to AB 579 but found the issue of residency and movement restrictions under SB 471 moot in light of the State of Nevada's judicial admission that they would not retroactively impose SB 471's requirements. See generally Am C.L.Union of Nev. v Cortez Masto, 670 F.3d 1046 (9th Cir 2012) ("Masto II"). On remand, at a status conference, Plaintiffs raised the issue that they continued to be subjected to identical movement restrictions as those imposed by SB 471. Defendants responded that they were exercising their general authority under NRS 213.1243 rather than the specific restrictions outlined in SB 471 and identified other statutes that they claimed gave them the authority to impose retroactive movement and residency restrictions. Plaintiffs filed the instant action on August 25, 2015.

### B. PLAINTIFFS

The Plaintiffs in this case are registered sex offenders who have completed their sentences and are now subject to lifetime supervision status.

#### i. *Terry Green, Doe 19*

Plaintiff Terry Green, Doe 19, committed a sexual offense on or between July 1, 1997, and August 31, 1997. He pled guilty on September 25, 1998. He was sentenced on November 30, 1998, for the crime of attempted sexual assault and coercion. He was incarcerated from 1998 to 2010. On the day he was scheduled to be released from prison, he was told that he had to sign a lifetime

supervision agreement, but he refused. He later signed several lifetime supervision agreements. On October 16, 2012, he signed a formalized lifetime supervision agreement. The agreement was also signed by Katie Bregg, Chief Parole Officer, on July 23, 2012. The agreement stated that he could not be in, or near, a playground, school, school grounds, a motion picture theater, and/or a business that primarily has children as customers or conducts events that primarily children attend.

Before his release from prison, Mr. Green wanted to live with his wife and daughter, but the Division of Parole and Probation ("the Division") denied this request. Instead, he moved to his father's house upon his release. Mr. Green suffered from emotional hardship because he was forced to live separately from his wife and daughter. In his response to Defendants' Interrogatories asking him to identify any location where he sought to reside but was not permitted to live, he stated that the question was "NA."

On March 30, 2011, Mr. Green violated his lifetime supervision agreement by going to Del Sol High School, transporting a child under the age of 18, possessing a cellular telephone with internet capabilities, and/or consuming an alcoholic beverage, and/or possessing a pornographic video. He went to prison for 16 months. The violation occurred because he was living with his wife and daughter.

Beginning on September 3, 2015, he committed the offense of violation of lifetime supervision by a convicted sex offender. The violations were connected to his travel to his wife's house and dropping his daughter off at school. Officer Wilson Carlos was surveilling him and he lost his job due to this surveillance. A September 15, 2017, state court document prepared by Officer Carlos provides that Mr. Green failed to attend sex offender counseling, failed to stay at his residence, failed to abide by a set curfew, and failed to pay supervision fees. Another state court document providing amended information states that Mr. Green attempted to not attend counseling and/or attempted to live at an unknown residence without the approval of his supervising officer. Mr. Green served 24 months in prison for the second violation and was released on January 19, 2019.

**ii. *Tania Scott (Gates), Doe 26***

Doe 26, Tania Scott, formerly known as Tania Gates, committed a sexual offense on or

about March 1, 2004, and December 4, 2006. On May 23, 2007, she was sentenced for the crime of lewdness with a child under 14 and child abuse and neglect. She was released from prison in September 2011 and her parole expired in November 2011. On November 14, 2011, she signed a lifetime supervision agreement. The agreement was also signed by Debe Williams, Chief Parole Officer, on September 9, 2011. The agreement stated that she could not be in or near a playground, school, school grounds, a motion picture theater, and/or a business that primarily has children as customers or conducts events that primarily children attend. She was told by a parole officer that she had to be 1,000 feet from a school or place where a business catered to children. She was a Tier I offender.

While in prison, Ms. Scott had made plans to return to her family in Oregon. She was not allowed to leave the state. She spent two weeks in a halfway house, then was homeless or living in weekly rentals. She found an apartment in 2014 for a year or two. When she could not afford it, she returned to being homeless or living in weekly rentals. She was depressed because she could not live in Oregon. She received an interstate compact in 2019 allowing her to travel to Oregon.

**iii. *Joshua Crowe, Doe 25***

Joshua Crowe, Doe 25, committed a sexual offense on or about November 24, 2006, and December 24, 2006. He pled guilty on November 20, 2007. He was sentenced on January 24, 2008, for the crime of attempted lewdness with a child under the age of 14. On January 3, 2013, he signed a lifetime supervision agreement. He was informed by the Board that he had to sign it in order to be released from prison. The agreement was also signed by Katie Bregg, Chief Parole Officer, on December 4, 2012. The agreement stated that he could not be in or near a playground, school, school grounds, a motion picture theater, and/or a business that primarily has children as customers or conducts events that primarily children attend.

An additional page, also signed on January 3, 2013, specifically provided that an offender shall not "knowingly be within 500 feet of any place" designed primarily for use by or for children and that "[t]he provisions of this subsection apply only to a sex offender who is a Tier 3 offender." Additionally, a Tier 3 offender shall "reside at a location only if the residence is not located within 1,000 feet of any place" designed primarily for use by or for children. Mr. Crowe was not a Tier 3

sex offender but was told that he had to abide by these conditions. He was a Tier 1 offender.

Mr. Crowe sought to live with his mother after his release from prison. His mother's apartment overlooked a swimming pool and was 100 feet from a place children would frequent. On that basis, this living situation was denied by three unidentified members of the Board. He was told he could not be within 500 to 1,000 feet of a park, school, movie theatre, or anywhere with children. His mother had to relocate to another apartment in that complex. Later, he wanted to move out and any new residence had to be approved. He was told he could not reside with his child and the mother of his child. He ultimately received approval. The uncertainty around whether he would receive approval for housing imposed stress on him.

**iv. *Joseph Defuria, Doe 13***

Joseph Defuria, Doe 13, committed a sexual offense on or about June 26, 2006, and June 28, 2006. On September 19, 2007, he pled guilty. On January 9, 2008, he was sentenced for attempted lewdness with a child under the age of 14. Mr. Defuria was allowed to go to Arizona to serve his probation. Upon the expiration of his probation in 2010, he entered into a lifetime supervision arrangement while still in Arizona. He signed an interstate compact on February 4, 2010. He needed permission from the Arizona Parole Division to leave the state. In November 2012, he was placed under the supervision of Pine County in Arizona. He left Arizona in 2018 and moved back to Nevada. He did not recall still being subject to certain conditions once back in Nevada. He was released from lifetime supervision in 2019. Between 2018 and 2019, he was homeless in Nevada.

**v. *Barty Scott, Doe 17***

Barty Scott, Doe 17, committed a sexual offense on or between February 1, 2003, and March 31, 2003. He was sentenced on July 8, 2004, for attempted lewdness with a child under the age of fourteen. He was released in 2008. He received no formal lifetime supervision agreement. He was told he could not be near certain places where children frequent such as a school. He absconded in 2009.

In 2010, he was arrested for absconding. He was sentenced to eighteen month and received a conviction for violation of lifetime supervision for failure to register. In 2012, he signed a lifetime

supervision agreement. It was part of his release paperwork from the prison. The agreement stated that he could not be in or near a playground, school, school grounds, a motion picture theater, and/or a business that primarily has children as customers or conducts events that primarily children attend. He was told he could not be within 1,000 feet of locations frequented by minors.

He was approved to live at an address on Fremont Street but lost the housing and job when his supervising officer called them. After that, he could only find seedy weekly motels for two to three years. It was stressful to live in such areas. His conditions of lifetime supervision were terminated in 2020.

**vi. *Dwight Bellard, Doe 12***

Dwight Bellard, Doe 12, entered an Alford plea for attempted lewdness with a child under the age of 14 on March 30, 2009. The offense occurred sometime in 2003 or 2004. He was sentenced on July 2, 2009. On December 5, 2012, he signed a lifetime supervision agreement. It was presented to him by a parole officer at the end of his probationary period. The agreement was also signed by Katie Bregg, Chief Parole Officer, on August 12, 2012. The agreement stated that he could not be in or near a playground, school, school grounds, a motion picture theater, and/or a business that primarily has children as customers or conducts events that primarily children attend.

On September 25, 2012, he signed an additional document with conditions of lifetime supervision. It specifically provided that an offender shall not "knowingly be within 500 feet of any place . . . designed primarily for use by or for children" and that "[t]he provisions of this subsection apply only to a sex offender who is a Tier 3 offender." Additionally, if the offender is a Tier 3 offender, then the offender shall "reside at a location only if the residence is not located within 1,000 feet of any place . . . that is designed primarily for use by or for children[.]" Mr. Bellard testified that he was a Tier 1 or Tier 2 offender. Nonetheless, he was told he could not be within 1,000 feet of locations frequented by minors.

On October 9, 2012, he filed an appeal of lifetime supervision to the Board. He sought to travel outside the country and to be released from counseling. He also sought release from the following condition: "(1) Not possessing an electronic device capable of accessing the internet." On August 11, 2014, he received permission to leave Nevada to go to California.

Mr. Bellard was told he could not go to a movie theatre, so he filed an appeal asking to go to a theatre. He also asked to take his dog to a dog park. He appeared before the Board in October 2012. His request to go to the movie theatre was denied by the Board. His request to take the dog to the park was originally denied, and he was told he would need a letter from a psychiatrist that the dog is an emotional support dog. He received such a letter and he was allowed to go to Horseman's Park in the mornings. He lived in his home from 2008 to the end of his term of lifetime supervision in 2019.

**vii. *Jerod Updike, Doe 1***

Jerod Updike, Doe 1, completed his prison term in 2007. He was placed on lifetime supervision when he was released from prison. A "Board of Parole Commissioners Action" dated April 24, 2008, provided certain special conditions of lifetime supervision, though none were related to residency or movement restrictions. It was signed by Commissioner Connie S. Bisbee and approved or ratified by Commissioners Baker, Jackson, and Chairman Selling. Mr. Updike testified to receiving that document around April 24, 2008.

On January 5, 2011, he signed an amended lifetime supervision agreement. It was a duplicate of previous lifetime supervision agreements that he had signed. It removed conditions which restricted him from being near a specific person and accessing a phone. The agreement stated that he could not be in or near a playground, school, school grounds, a motion picture theater, and/or a business that primarily has children as customers or conducts events that primarily children attend.

While he was in prison, in the fall of 2007, he requested to live with his parents. The probation department said he could not live with his parents because they lived right behind a school. This was the only time that someone denied his request to live at a particular location. He did not recall a specific conversation about the number of feet he had to stay from a school. He had to find a hotel where he paid day-to-day. It was hard to not have family support, and he could only afford to live in a "bad area" since he could not live with his parents. He stayed in one location for eight years. Now, he lives with his parents.

///

**viii. *Kristian Prestholm, Plaintiff Doe 7***

On November 23, 2010, Kristian Prestholm, Doe 7, signed a lifetime supervision agreement. When he was about to leave prison, Officer Pollock told him he had to sign the document. It was also signed by Chief Parole Officer Debe Williams. The agreement stated that he could not be in or near a playground, school, school grounds, a motion picture theater, and/or a business that primarily has children as customers or conducts events that primarily children attend.

On December 1, 2010, he signed a "special conditions for lifetime supervision per NRS 213.1243," which stated that an offender may "not knowingly be within 500 feet of any place . . . that is designed primarily for use by or for children" and that "[t]he provisions of this subjection apply only to a sex offender who is a Tier 3 offender." It also stated that a Tier 3 offender may "[r]eside at a location only if the residence is not located within 1,000 feet of any place . . . that is designed primarily for use by or for children[.]" He was a Tier 1 offender when he was released from prison. He testified that he understood that some of the restrictions should not apply to him because he was not a Tier 3 offender.

During his pre-release sentencing report, sometime around 2009–2010, he was told that his parole plan was denied, and he could not go to California because his sister lived too close to a park. He understood that an interstate compact would be needed for him to go to California. He testified that Defendant Corda was present during a parole hearing in 2006, and another parole hearing in 2009/2010, when his conditions of lifetimes supervision were imposed on him. From November 30, 2010, onwards, four parole officers, including Officer Gallagher, told him that he was subject to a variety of conditions. He was told that he could not be 500 or 1,000 feet from locations children would frequent, but did not recall the date of the conversations informing him of this restriction. Since his release from prison, he has been at the same residence.

He got married on December 7, 2013, and had three stepchildren. They were 3.5, 6, and 7 years old. The restrictions prevented him from attending parent/teacher conferences. Twelve years later, his marriage dissolved because of this restriction. He did not have a normal life. He testified that the restriction preventing him from being near minor children meant he could not attend get-togethers with family.

He challenged certain conditions and had them lifted in 2015–2016, including the computer restriction and the restriction related to distances from parks and schools. He testified that Defendant Corda was present for two hearings in 2012 about the monitoring of his computer and being too close to schools. As a result of the hearings, he had the conditions lifted. He was released from supervision in 2022–2023.

**ix. *Frank Burns, Plaintiff Doe 28***

Frank Burns, Doe 28, pled guilty on October 12, 2009. The Amended Information attached to his plea provided that the offense occurred between September 1, 2004, and July 31, 2007. He was sentenced on February 17, 2010, for attempted lewdness with a minor. He received an honorable discharge from parole in 2014. He signed a lifetime supervision agreement on February 25, 2015. The agreement was also signed by Officer Woodburn and Chief Parole Officer Lucy Rico. The agreement stated that he could not be in or near a playground, school, school grounds, a motion picture theater, and/or a business that primarily has children as customers or conducts events that primarily children attend.

On February 25, 2015, he also signed a "special conditions for lifetime supervision per NRS 213.1243," which stated that an offender may "not knowingly be within 500 feet of any place . . . that is designed primarily for use by or for children" and that "[t]he provisions of this subjection apply only to a sex offender who is a Tier 3 offender." It also stated that a Tier 3 offender may "[r]eside at a location only if the residence is not located within 1,000 feet of any place . . . designed primarily for use by or for children[.]"

The paperwork said he had to stay 500 feet away from a school. In 2015 or 2016, he was told the same fact by his parole officers, including Officer Cummings, though he could not recall the exact date or names of the other officers. He has four grandchildren, and he could not take them to places like the park or school. He is a truck driver and could not make deliveries to certain places like schools.

An April 4, 2017, letter from the Board notified Mr. Burns of an amended order setting his conditions of lifetime supervision. The amended conditions did not include any movement or residency restrictions related to locations where children frequent. It stated that the amended order

superseded previous orders. The amended order was ratified by the following parole commissioners: Endel, Jackson, Corda, and Chairman Bisbee.

**x. *Marco Reid, Doe 3***

On August 13, 1997, Marco Reid, Doe 3, accepted a plea deal and was sentenced on October 9, 1997, for lewdness with a child under the age of 14 and for possession of a visual presentation depicting sexual conduct of minor children under 16 years of age. He was honorably discharged from probation on August 22, 2002, and started his sentence of lifetime supervision. Two years later, he absconded and went to Michigan. In 2012 or 2013, he returned to Nevada and turned himself in. He was put back on lifetime supervision. He signed a lifetime supervision agreement on January 27, 2014. The agreement stated that he could not be in or near a playground, school, school grounds, a motion picture theater, and/or a business that primarily has children as customers or conducts events that primarily children attend.

When he was first placed on supervision in 2002, he lived near a park and his probation officer told him that he had to move. During a Board hearing, they said he could not reside near a school and said 500 or 1,000 feet was the distance. In 2002 or 2003, he was denied a request to move somewhere near a park. He lost his job as a barber in 2002 or 2003 because his boss thought he was being untruthful about being on probation.

After he was placed back on lifetime supervision in 2014, he tried to transfer to California but was not allowed. He has not had stable housing since 2014. He could not get a job because people in the community knew he was a sex offender. In response to Defendants' interrogatory asking if he has ever been denied a place to reside, he wrote: "None."

**xi. *David Banuelos, Doe 2***

David Banuelos, Doe 2, was convicted of lewdness with a child under the age of 14. He was sentenced on November 1, 2007. On December 22, 2010, he was honorably discharged from probation and handed a lifetime supervision agreement and "special conditions for lifetime supervision." He signed the "special conditions" page. The agreement was also signed by Debe Williams, Chief Parole Officer. The agreement stated that he could not be in or near a playground, school, school grounds, a motion picture theater, and/or a business that primarily has children as

customers or conducts events that primarily children attend.

The agreement included "special conditions for lifetime supervision per NRS 213.1243," which stated that an offender may "not knowingly be within 500 feet of any place . . . that is designed primarily for use by or for children" and that the "provisions of this subjection apply only to a sex offender who is a Tier 3 offender." It also stated that a Tier 3 offender may "[r]eside at a location only if the residence is not located within 1,000 feet of any place . . that is designed primarily for use by or for children[.]"

He was handed papers with the 500-foot restriction in it. He did not recall a specific conversation with someone from the Division telling him that it applied, though they asked him if he understood what he was signing. He did not testify to a conversation about the 1,000-foot residency restriction though he had to let the Division know before he moved. He could not take his son to movies or Disney Land. He missed family reunions at the park. The reason he could not go to Disney Land or attend family reunions was because he could not be near children under the age of 18. He testified that he was afraid of doing anything. It was hard to find a decent place to live. He did not recall a specific address where he wanted to live but was denied permission to move there by a parole officer. He would call and ask permission to make sure his housing fit within the parameters before moving. He tried to live with family members with no children. He testified that his restrictions were removed around 2016.

**xii. *Julian Grijalva, Doe 5***

On June 8, 2006, Julian Grijalva, Doe 5, pled guilty to the offense of attempted lewdness with a minor. He was sentenced on August 8, 2006, released from prison in 2011, and on parole from 2011 to 2014. When his parole expired, he was put on lifetime supervision. On June 25, 2014, he signed a lifetime supervision agreement. The agreement was also signed by Katie Bregg, Chief Parole Officer, on July 18, 2013. The agreement stated that he could not be in or near a playground, school, school grounds, a motion picture theater, and/or a business that primarily has children as customers or conducts events that primarily children attend. He did not recall being told about specific 500-foot movement restrictions or 1,000-foot residency restrictions, but he remembered a parole officer saying that the same rules from parole applied. On parole, he could not be within

500 feet of a school.

Upon his release from prison, he moved in with his parents. His ten-year-old niece had to move out of the house. He could not attend family gatherings like Thanksgiving and Christmas because there were children present and he could gain access to the internet at these events. He met his girlfriend in 2013. In late 2014, he wanted to move in with his girlfriend but she lived across the street from Desert Pines High School so he could not live with her. He did not recall the address. He did not ask his parole officer for permission to live there because they had made it clear he could not be around schools. He testified that he thought the school was 200 feet from her housing. The imposition of various lifetime supervision conditions, including his inability to access the internet, live with his girlfriend, or move with her to Texas led to the end of the relationship, and he became depressed. In response to an interrogatory asking him to identify locations where he sought to reside but was not permitted to live, he wrote: "I did not seek my own place to live because I knew I would be denied because of my background."

**xiii.** ***Mario Jetton, Doe 22***

Mario Jetton, Doe 22, committed a sexual offense on January 2, 2000. He pled guilty to sexual assault with a minor under sixteen years of age in April 2000. He was sentenced on June 13, 2000. In 2005, he was released from prison on parole and when he finished parole, he was placed on lifetime supervision. On August 13, 2010, he signed a lifetime supervision agreement. The agreement was also signed by Debe Williams, Chief Parole Officer, on August 4, 2010. The agreement stated that he could not be in or near a playground, school, school grounds, a motion picture theater, and/or a business that primarily has children as customers or conducts events that primarily children attend.

He testified that parole officers would change the distance he had to be from a school from 500 feet to a 1000 feet and that it varied. When he and his fiancée had a daughter, they had some difficulties in finding a place to live because his fiancée wanted to live near a park. He felt like he could not be the type of father he wanted to be. He tried to apply to stay at hotels/motels on four or five instances. Between 2010 and 2016, he did not have a stable residence. He felt like the only place he could live was in a bad part of town on Boulder highway. On a date he could not recall,

he moved and a parole officer agreed to it, then told him that he could not stay there. At some of the places where he tried to stay, the apartment management would look up his background and he would be denied. Then, he moved in with his mother in Anthem in 2016 or 2017. He was a Tier 3 offender. He responded to Defendants' interrogatory asking for each location where he sought to reside but had not been permitted to live by writing: "None."

**xiv. *Ruben Diaz, Doe 27***

Ruben Diaz, Doe 27, committed a sexual offense before 2004. He was sentenced for attempted lewdness with a minor on March 17, 2004. He stated that, upon his release from prison in 2009, he signed a lifetime supervision agreement in the caseworker's office; specifically, the lifetime supervision agreement was signed on August 15, 2010. The agreement stated that he could not be in or near a playground, school, school grounds, a motion picture theater, and/or a business that primarily has children as customers or conducts events that primarily children attend. Additionally, an amendment to the agreement dated March 2, 2009, noted that a Tier 2 offender may not "knowingly be within 500 feet of any place . . . designed primarily for the use by or for children[.]"

He was released from prison in 2009 and moved in with his parents. He wanted to move out of his parents' house. In 2013, he submitted a request for a new location at the Catalina Apartments and was rejected by an Officer Woodbury with the Division. He asked to move to a different apartment on Rainbow and Cheyenne in November or December of 2013 and was denied. He refrained from submitting further requests. It was difficult for him to stay with his parents. His girlfriend broke up with him. He also stated that he could not spend time with his nephew. In response to an interrogatory asking if he had sought permission to reside at a location and was denied, he responded "none." As a result of a failed urine drug test, he was sent back to prison and, in 2013, elevated to Tier 3.

On June 19, 2017, he was presented with an Order Amending the Conditions of Lifetime Supervision signed by Parole Commissioners Tona Corda, Ed Gray, Michael Keller, Lucille Monterde, Adam Endel, and Susan Jackson. It was also signed by Chairman Connie S. Bisbee. It contained language requiring a Tier 3 Offender to reside at a residence that was not located within

1,000 feet of a structure designed primarily for use by children.

**xv. *Eddie Ridenour, Doe 31***

Eddie Ridenour, Doe 31, entered an Alford plea to the crime of Attempted Lewdness with a Child under the Age of 14 on in 2014. The date of offense was on or between January 1, 2005, and December 31, 2010. He testified recalling that the offense occurred in 2005. He was sentenced on September 3, 2014.

When he was honorably discharged from probation, he was told to write his name on a Lifetime Supervision Understanding in September 2, 2017, which stated that he may reside at a location "only if the residence is not located within 500 feet of any place . . . that is designed primarily for use by or for children[.]"

He and his wife purchased a home in 2018. Shortly after that, he requested an interstate compact transfer to Washington. He received verbal approval and transferred to Washington for a week or so. He was told by a Washington state supervisor that he could not stay at his Washington address because there was a church behind the apartment complex that had a day care. He then relocated back to Reno, Nevada. He and his wife rented an apartment and then bought a house. In the process of buying a house, he testified that he ran an address at 3105 May Rose Circle, Reno, Nevada by his supervisor, Officer Cummings, in May 2020. Officer Cummings indicated that it was too close to a park. He discussed the residency restrictions with various officers in Reno: Nicholas Santori, Dale Bennett, Justin Gosser, Tyler Roukie, and Shuman. He responded to an interrogatory asking him to identify each location in which he sought to reside but was denied permission with "not applicable."

He also testified that the lifetime supervision requirements were an imposition because his children and grandchildren were primarily associated with places he was not allowed to be near.

**xvi. *Donald White, Doe 32***

Donald White, Doe 32, entered a guilty plea to the offense of use of technology to lure children on March 28, 2006. The date of offense was on or between November 3, 2005, and February 21, 2006. He was sentenced in April 2007. He was on parole from December 2015 to September 6, 2016.

After he was honorably discharged from parole, he was put on lifetime supervision. His honorable discharge document was signed by Chief Natalie Wood. He received a document in September 2016 from Officer Gallagher. The document states: "You shall not be in or near: a) playground, school, or school grounds; b) A motion picture theatre; c) A business that primarily has children as customers or conducts events that primarily children attend." This document was signed by Parole Commissioner Adam Endel.

In October 2016, Officer Gallagher informed him that he had to move because he was too close to a school. At four or five other times, the dates of which he could not recall, he sought to move to a particular location. Officers Gallagher, Page, and Antonucci denied these requests. In response to an interrogatory asking him to identify locations where he sought to reside but was not permitted to live, he provided: "I was never denied a location to live after my lifetime supervision came in effect because I always measured the distance from schools, parks, et cetera, before I asked permission to move."

Officer Gallagher told him that he had to be 1,000 feet from a school or park. He has five children, and he was not able to attend his kids' events such as football games. He also could not attend parent-teacher conferences.

**xvii. *George Rosenthal, Doe 18***

On February 27, 2008, George Rosenthal, Doe 18, entered an Alford plea for attempted lewdness with a child under the age of 14. The crime occurred on or about June 2, 2005. He was sentenced on April 30, 2008. The lifetime supervision agreement was signed on June 26, 2012. It was also signed by Dregg, the Chief Parole Officer on February 2012. The agreement stated that he could not be in or near a playground, school, school grounds, a motion picture theater, and/or a business that primarily has children as customers or conducts events that primarily children attend. Another condition in the agreement was that he could not have contact with a person less than 18 years of age in a secluded environment unless another adult who has never been convicted of an offense listed in NRS 179D.410 was present. He was told to sign it when he was in prison and that he would not be released without signing it.

In 2012, he sought to move in with his girlfriend, and he was told the residence was too

close to a school. His girlfriend had two minor children who resided with her. His girlfriend later became his wife. After he divorced from his wife, he tried to move into a town house somewhere in Green Valley in 2015, but this request was denied by a parole officer because it was too close to a school. He could not pick his son up from day care, the park, or soccer. The experience of lifetime supervision destroyed his marriage and caused him to attempt suicide.

**xviii. *Gonzales Ramos Lopez, Doe 30***

Gonzales Ramos Lopez, Doe 30, entered a plea of guilty to the crime of Attempted Lewdness with a Child Under the Age of 14 on June 15, 2011. He testified that the crime occurred between 2011 and 2013. The Information filed along with his guilty plea states that the date of offense was on or between February 2004 and June 2011. He was sentenced on September 21, 2011. A letter from Kathi Baker, a Management Analyst with the Board dated December 8, 2016, informed Plaintiff that the Board was imposing conditions of lifetime supervision.

An undated and unsigned document titled "Special Conditions for Timeline Supervision" stated that he "may not knowingly be within 500 feet of any place. . . designed primarily for use by or for children" and that "[t]his subsection only applies to Tier III offenders." Additionally, it provided that a Tier 2 offender "may only reside at a location if it is not located within 1,000 feet of any place . . . designed primarily for use by or for child[.]" Plaintiff testified that he received the document when he was leaving jail. He was told he could not be within 1,000 feet of a school or park.

He had to leave his residence in North Las Vegas because it was too close to a school or park. He could not go near a park or attend service at his church.

**xix. *Eric Zaqueo Archuleta, Doe 16***

Eric Archuleta, Doe 16, pled guilty to the crime of attempted lewdness with a child under 14 years of age on April 21, 2005. Mr. Archuleta testified that the offense occurred in 2005. He was sentenced on June 30, 2005. He was placed on lifetime supervision in 2007 after his probation expired.

A Board Worksheet for Lifetime Supervision for Sex Offenders has Mr. Archuleta's name and is dated February 26, 2013. It states that a person shall not be in or near a playground, school,

school grounds, motion picture theater, and/or a business that primarily has children as customers or conducts events that primarily children attend. He was also not allowed to have contact with a person less than 18 years of age in a secluded environment, unless another adult who has never been convicted of an offense listed in N.R.S. 179D.410 is present. The conditions were recommended by Commissioner S. Jackson, T. Corda, A. Endel, and Chairman C. Bisbee. It was signed by T. Corda. It was not signed by Mr. Archuleta.

He was told he could not be within 500 or 1,000 feet from any school, park, or playground. He testified that everywhere he resided was not near a school, park, or playground. Starting in 2010 with the birth of his son, he was unable to attend parties with him at the park or take him to school.

**xx. *John Kanipe, Doe 21***

On March 4, 2001, John Kanipe, Doe 21, entered an Alford plea for open or gross lewdness and attempted sexual assault. The offense occurred on or between January 2001 and March 20, 2001. He was sentenced on April 29, 2002. An unsigned and undated Lifetime Supervision Agreement includes Mr. Kanipe's name. He testified that he received it around February 3, 2005. Next to the following condition, the agreement is marked "EXCLUDED": "You shall shall not be in or near a playground, school, school grounds, motion picture theater, business that primarily has children as customers or conducts events that primarily children attend." The document also states that it was amended on November 20, 2012, to exclude the requirement that he not be in or near these locations as the victim of his offense was an adult.

A July 29, 2020, letter to Mr. Kanipe from Debra Hausman, a Management Analysis with the Board, stated that additional conditions would be effective on January 1, 2021. The amended conditions were approved by Chairman DeRicco and Commissioners Jackson, Baker, and Corda. They did not include any residency or movement restrictions.

He was told he had to be 500 or 1,000 feet from a school but did not recall the names of the officers who told him this, nor the dates on which the conversations took place. He was not able to bring his children to their school functions, such as games or parent-teacher conferences. He felt like he missed out on his kids' entire high school athletic careers.

### C. Division Defendants

The Division of Parole and Probation is located within the Department of Public Safety. The Division is led by the Chief Parole and Probation Officer. The Chief Parole and Probation Officer reports to the Director of the Department of Public Safety.

#### i. *Natalie Wood*

Natalie Wood was hired by the Division in 1999 and served as Chief from May 5, 2014, until June 7, 2019. She worked alongside the Board, but it was a separate entity from the Division. The Division would enforce rules applicable to lifetime supervision offenders. When Natalie Wood was promoted to Chief, there were roughly 21,000 offenders, some of whom were serving a special sentence of lifetime supervision. It was an individual parole officer's role to monitor offender compliance with supervision rules, communicate directly with the offender, answer questions, review requests about the supervision rules, and make decisions regarding those rules with respect to individual offenders. If an officer had a question about enforcement with respect to a particular offender, that question would be directed to a sergeant. In her role as Chief, she was not involved in offender-specific decisions regarding supervision conditions, but she did set overall policy and guidance for the officers to follow. She would periodically monitor officers to ensure they were following the directives being issued.

#### ii. *Division Directive 6.2.111*

Chief Wood amended Division Directive 6.2.111 on July 27, 2015. The directive provided that, for lifetime supervision offenders, the Division would enforce the 1,000-foot rule on: (1) all Tier 3 offenders convicted of any offense enumerated in NRS 213.1255(6) whose victim was under the age of 14 years and (2) for other sex offenders whose sex offense involved a victim who was a minor child. Therefore, the directive did not restrict the enforcement of the 1,000-foot residency restriction to Tier 3 offenders. Rather, the difference between Tier 3 offenders and offenders whose crimes involved minor children was that—for the first group—there would be no exceptions and—for the second group—exceptions would be considered on a case-by-case basis. Therefore, Chief Wood directed that "a distance of 1000 feet will be the minimum standard when approving a residence" for sex offenders whose conviction involved a minor child regardless of tier status. In

fact, even if a sex offender's conviction did not involve a minor child, the 1,000-foot residency requirement could be—and would be—imposed if there were compelling reasons to do so. So long as a condition of an offender's lifetime supervision was that the Division approve their residence, then the Division "may impose the 1,000-foot rule" on any offender whose victim was a minor child. The Directive noted that "[s]aid limitation is not mandated by statute" but did not provide any alternative basis for imposing the 1,000-foot restriction. The Directive also did not provide that a 1,000-foot restriction could not be applied to offenders convicted before October 1, 2007.

An August 2015 flowchart approved for use by Ms. Wood during her tenure instructed parole officers on how to apply Division Directive 6.2.111. It stated: even if an offender is not a Tier 3 offender, the 1,000-foot rule could apply to a sex offender whose victim was under the age of 18 *insofar* as they are subject to a condition of supervision which requires the Division to approve their residence(s). In doing so, the flowchart invoked Directive 6.2.11 while disclaiming SB 471. Once again, the flowchart did not provide what alternative basis of authority allowed Ms. Wood to enforce, per Division Directive 6.2.11, this 1,000-foot restriction on any offender whose victim was a minor child. The flow chart did not provide that the 1,000-foot restriction could not be applied retroactively.

A January 2017 flowchart that was in use during Ms. Wood's tenure adds a condition to the imposition of the 1,000-foot residency requirement. Now, along with being a Tier 3 offender with a child victim convicted of a crime included in NRS 213.1255(6), the offender must have been sentenced after February 8, 2013. Once again, even if an offender did not meet these criteria, but the sex offense involved a minor and they had as a condition of supervision that the Division approve their residence, then the 1,000-foot rule could still apply per Division Directive 6.2.111.

Chief Wood testified that the result of these Directives meant that officers had discretion in how to impose the conditions on Tier 1 and Tier 2 offenders, but not for Tier 3 offenders. She also testified that, as of 2015 when she amended the Directive, if an offender on lifetime supervision whose offense occurred prior to 2007 sought to move residency, then the 1,000-foot restriction would apply to them.

///

**iii. *Division Directive 1.02.002***

Chief Wood amended Division Directive 1.02.002 on June 8, 2017. Similar to Division Directive 6.2.111, it provided that the Division could impose the 1,000-foot rule on other sex offenders whose conviction involved a victim who was a minor child under 18 years old so long as a condition of their supervision was that the Division approve their residence. She acknowledged that this limitation was "not mandated by statue." The Directive further provided that "Tier III offenders are required to be governed by the 500 foot rule[.]" Ms. Wood testified that the 500-foot movement restriction did not apply to Tier 1 and Tier 2 offenders. She also testified that a parole officer could exercise discretion on when to apply the 1,000-foot rule if the offender was Tier 1 or Tier 2.

**iv. *January 2, 2019, Executive Order***

On January 2, 2019, in the wake of ACLU v. Mastro, Chief Wood issued an Executive Order stating: "Based upon the arguments made by the State in the Masto case, Division staff are prohibited from applying the 500' or 1000' rules to qualifying sex offenders convicted prior to February 8, 2013." She testified that it was her understanding that there was no authority to impose the 1,000-foot residency restriction retroactively. Therefore, per the Order, "the evaluation of any residence for this offender group is to be based upon whether the residence creates a legitimate public safety concern to the public. A residence may not be denied because it falls within 1000' of a location designated primarily for use by or for children." It also stated, that "[f]or offenders convicted prior to February 8, 2013, no movement restrictions may be placed upon the offender based upon the 500' rule." However, "[t]he 500' and 1000' rules may be referenced and appropriately applied to qualifying sex offenders convicted on or after February 8, 2013." She testified that, prior to the imposition of this Executive Order, parole officers may have been under the impression that they could deny a residence or movement based off the 500-foot or 1,000-foot rule.

**D. BOARD OF PAROLE COMMISSIONERS DEFENDANTS**

The Board, which is led by the Parole Commissioners, is a subdivision of the Nevada Department of Public Safety. It is authorized to "execute, administer and enforce, and perform the

functions and duties provided in Chapters 176A and 213 of NRS relating to parole and probation." NRS § 480.110. The Board is tasked with granting and/or denying parole. The Division then supervises those that are granted parole and enforces the conditions set by the Parole Commissioners. The Parole Commissioners report directly to the Governor.

**i. *Tony Corda and Adam Endel***

Defendant Tony Corda was a parole commissioner from July 2009 to January 2021. Defendant Adam Endel served as a parole commissioner with the Board from March 2009 to November 2019. Defendants Tony Corda and Adam Endel's role as parole commissioners was to review cases, grant or deny parole, and set lifetime supervision conditions. If an offender on lifetime supervision were to ask what a restriction preventing them from being near a school or playground might mean in practice, the answer would depend on the discretion of their parole officer. The specific distances would be enforced by parole officers supervised by the Division. Parole commissioners do not supervise parole officers. Once the parole commissioners set the conditions, they have no further involvement. They have no authority over the Division nor any individual parole officers. Parole commissioners are not bound by policy decisions issued by the Division.

Parole commissioners did hold hearings setting conditions for lifetime supervision or for offenders appealing their conditions. The Board would amend conditions of lifetime supervision and an offender could seek to change their conditions. Mr. Corda and Mr. Endel did not recall an offender appearing at a hearing and asking if they could reside at a particular location.

**ii. *Lifetime Supervision Agreements***

Numerous Plaintiffs, including Terry Green, Tania Gates, Joshua Crow, Barty Scott, Dwight Bellard, Jerod Updike, Kristian Prestholm, Frank Burns, Marco Reid, David Banuelos, Julian Grijalva, Mario Jetton, Ruben Diaz, and George Rosenthal introduced the same lifetime supervision agreements as exhibits.[1] They are signed by different Chief Parole Officers but stated

[1] Several plaintiffs presented slightly different paperwork, though the documents imposed the same standard conditions. Plaintiff John Kanipe's Lifetime Supervision Agreement was unsigned and stated "Board of Parole Commissioners" at the top of the document. Plaintiff Donald White's "Order Setting Conditions of Lifetime Supervision" was signed by Parole Commissioner Endel and approved, or ratified, by Commissioner S. Jackson, T.

that the conditions were imposed by the Parole Commissioners. Defendants Corda and Endel testified that a standard condition for parole was not being near playgrounds, schools, school grounds, and/or motion picture theatres. This standard condition did not reference a specific distance. Defendant Corda testified that he assumed this standard condition was applied to people who had an offense date earlier than 2007. The agreements did not contain any provision to exempt people whose date of offense was prior to 2007.

Five Plaintiffs—Dwight Bellard, Kristian Prestholm, Frank Burns, David Banuelos, Joshua Crowe, and Gonzalo Ramos Lopez—introduced documents that contained a specific: (i.) 500-foot movement restriction and (ii.) 1,000-foot residency restriction. Additionally, Plaintiff Eddie Ridenour's Lifetime Supervision Understanding stated that he could only reside at a location if it is not located within 500 feet of a place designed primarily for children.

**iii. *June 2017 Order Amending Conditions***

On June 19, 2017, the Parole Commissioners issued an Order amending conditions of lifetime supervision to prevent the retroactive application of the 500-foot movement restriction and 1,000-foot residency restriction. This Order was signed by Chairman Connie S. Bisbee and Parole Commissioners Michael Keeler, Tony Corda, Ed Gray, Susan Jackson, Lucille Monterde, and Adam Endel. It was approved at a public meeting.

It stated that a Tier 3 offender convicted on or after February 8, 2013, "may not knowingly be within 500 feet of any place . . . that is designed primarily for the use by or for children[.]" A footnote provided that this condition was established by Senate Bill 471 and was subsequently ordered to be applied only to convictions occurring on or after February 8, 2013.

The Order also provided that Tier 3 offenders convicted on or after February 8, 2013, could reside at a location "only if the residence is not located within 1,000 feet of any place . . . that is

---

Corda, and A. Endel, as well as Chairman C. Bisbee. Plaintiff Eric Archuleta's "Worksheet for Lifetime Supervision for Sex Offenders," which was a working document and not a final lifetime supervision agreement, was signed by Commissioner T. Corda and approved, or ratified, by Commissioners S. Jackson, T. Corda, and A. Endel, as well as Chairman C. Bisbee. Plaintiff John Kanipe's "Order Amending Conditions of Lifetime Supervision" was signed by Commissioner T. Corda and ratified by Commissioners Jackson, Baker, and Corda, as well as Chairman DeRicco. Plaintiff Jerod Updike's "Board of Parole Commissioners Action" was signed by Commissioner Connie S. Bisbee and approved, or ratified, by Commissioners Jackson, Baker, and Chairman Selling. Plaintiff Frank Burns received an amended order setting conditions of lifetime supervision that did not include residency or movement restrictions and was ratified by Commissioners Endel, Jackson, Corda, and Bisbee.

designed primarily for the use by or for children[.]" A footnote provided that this condition was established by Senate Bill 471 and that this section only applies to a person who is placed under a program of lifetime supervision before, on, or after October 1, 2007.

## III. FINDINGS OF LAW

The Court first considers Defendants Wood, Endel, and Corda's personal participation in the constitutional deprivations at issue in this case, before turning to whether each Plaintiff has established that they are entitled to compensatory damages for emotional distress.

### A. DEFENDANTS WOOD, ENDEL, AND CORDA'S PERSONAL PARTICIPATION

Liability under § 1983 arises only upon a showing of personal participation by a defendant. See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). "'Under section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability.'" Snow v. McDaniel, 681 F.3d 978, 989 (9th Cir. 2012) (*en banc*) (quoting Hansen v. Black, 885 F.2d 642, 645–46 (9th Cir. 1989)). Therefore, "[t]here is no respondeat superior liability under section 1983." Taylor, 880 F.2d at 1046. "A supervisor is only liable for constitutional violations of his [or her] subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." Id.

"A supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is 'a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" Snow, 681 F.3d at 989 (quoting Hansen, 885 F.2d at 646); see also Starr v. Baca, 652 F.3d 1202, 1205–1206 (9th Cir. 2011) ("The law clearly allows actions against supervisors under section 1983 as long as a sufficient causal connection is present and the plaintiff was deprived under color of law of a federally secured right."). The causal connection can include: "1) [the supervisor's] own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) conduct that showed a reckless or callous indifference to the rights of others." Lemire v. Cal. Dep't of Corr., 726 F.3d 1062, 1085 (9th Cir. 2013) (citations and internal quotation marks omitted); see also Watkins v. City of Oakland, 145 F.3d 1087, 1098 (9th

Cir. 1998) (alteration and internal quotation marks omitted). "The requisite causal connection can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or should have known would cause others to inflict a constitutional injury." Id. (citing Starr, 652 F.3d at 1207–1208 (9th Cir. 2011) (internal quotation marks omitted).

In addition, "[s]upervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of a constitutional violation.'" Crowley v. Bannister, 734 F.3d 967, 977 (9th Cir. 2013) (quoting Hansen, 885 F.2d at 646) (internal quotation marks omitted). Causation is essential to this type of claim. See Crowley, 734 F.3d at 977 (citing OSU Student Alliance v. Ray, 699 F.3d 1053, 1076 (9th Cir. 2012), cert. denied, No. 12-1296, 2013 WL 1808554 (Oct. 7, 2013)). The Ninth Circuit has held that "[a]dvancing a policy that requires subordinates to commit constitutional violations is always enough for § 1983 liability . . . so long as the policy proximately causes the harm—that is, so long as the plaintiff's constitutional injury in fact occurs pursuant to the policy." OSU, 699 F.3d at 1076. The Ninth Circuit expressly agreed with the Tenth Circuit, which held: "§ 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which 'subjects, or causes to be subjected' that plaintiff 'to the deprivation of any rights . . . secured by the Constitution . . . .'" OSU, 699 F.3d at 1076 (quoting Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)).

**i. *Defendant Wood***

In her role as Chief of the Division, Ms. Wood approved guidance on how lifetime supervision conditions should be imposed and promulgated the Division Policies that led parole officers to deny the Plaintiffs' housing requests and enforce the 500-foot movement restriction and 1,000-foot residency restriction.

Division Directive 6.2.11—which she updated on July 27, 2015—and Division Directive 1.02.002—which she updated on June 8, 2017, August 2, 2017, and January 31, 2017—concerned

the enforcement of the 1,000-foot residency restriction and 500-foot movement restriction and made no distinction between offenders whose date of offense was before or after 2007. Additionally, both the August 2015 and January 2017 flowcharts that were used during Ms. Wood's tenure stated that, even if the 1,000-foot rule did not apply per SB 471, it could still apply per directive 6.2.11—*i.e.*, the policy she issued. Parole officers were explicitly applying the policy she issued in order to determine whether the 1000-foot restriction applied to their offender(s) and none of these policies informed parole officers not to apply the condition to offenders convicted before October 1, 2007. Finally, Ms. Wood testified that, as of 2015, if an offender on lifetime supervision whose offense occurred prior to 2007 sought to move, the 1,000-foot restriction would apply to them.

After issuing an Executive Order on January 2, 2019, Ms. Wood testified that it was her understanding that there was no authority to impose the 1,000-foot residency restriction retroactively. The Order stated that the 500-foot movement rule could not apply to offenders convicted before February 8, 2013. However, prior to this January 2, 2019, Order, there was no policy informing parole officers that they should not apply the 1,000-foot residency restriction or 500-foot movement restriction retroactively.

Additionally, the Directives that Ms. Wood issued instructed parole officers to enforce the 1,000-foot residency restrictions on sex offenders whose conviction involved a minor child regardless of tier status and despite the fact that there existed no statutory authority to do so. Therefore, not only did she instruct parole officers to apply the 1,000-foot residency restriction in SB 471 retroactively, but she instructed them to apply a 1,000-foot residency restriction even on sex offenders who were not Tier 3 and when there was no statute providing the Division could do so.

Many Plaintiffs testified that parole officers informed them that they were subject to a 500-foot movement restriction and a 1,000-foot residency restriction. Even if an offender's lifetime supervision agreement did not contain an explicit 1,000-foot restriction, parole officers were instructed, per Division Directive 6.2.11, that 1,000 feet was the "minimum restriction" for an offender whose crime involved a minor child. As a result of Ms. Wood's Directives, the Division

had a *de facto* policy of enforcing the 1,000-foot residency restriction regardless of tier status and regardless of conviction date so long as a condition of supervision was that the Division approve the offender's residence.

**ii. *Defendants Endel and Corda***

The Doe Plaintiffs introduced their lifetime supervision agreements as evidence in support of a finding of personal participation against the Defendant Parole Commissioners. The majority of their agreements state that the Board of Parole Commissioners assigned their conditions. The majority of the agreements contain a condition that states that they shall not be in or near a playground, school, school grounds, motion picture theatre, and/or a business primarily for children. This language restricting offenders from being near certain locations with children existed before the passage of SB 471. SB 471 amended the "near" language and added the 500-foot and 1,000-foot restriction. It is the specific 500-foot movement restriction and 1,000-foot residency restriction that changed after the offenders were sentenced and that was then retroactively imposed on them. However, the majority of the Doe Plaintiffs' agreements do not contain the 500-foot or 1,000-foot restriction. Therefore, the orders setting conditions of lifetime supervision issued to the majority of Doe Plaintiffs do not reflect that Defendants Endel and Corda imposed the SB 471 500-foot movement or 1,000-foot residency restrictions.

Many of the offenders testified that although the 500-foot movement restriction and 1,000-foot residency restrictions were not in their lifetime supervision agreements, they were informed by their parole officers that they were subject to such restrictions. However, Defendants Endel and Corda, as Parole Commissioners, do not oversee the enforcement of lifetime supervision conditions, nor are they responsible for parole officers. Their role is limited to setting the conditions of lifetime supervision. Any interpretation of the conditions would be done by the supervising parole officer who was overseen by the Division. If a lifetime supervision agreement stated that the offender was restricted from being near a school and a parole officer applied this condition to mean that the offender could not be within 1,000 feet of a school, Defendants Corda and Endel are not liable for their actions. Therefore, in order to establish that Defendants Endel and Corda were responsible for imposing the 500-foot movement restriction and 1,000-foot

residency restriction, Plaintiffs would need to present evidence that they specifically set these conditions as a term of their lifetime supervision, or that they appeared before the Parole Board and were informed of these conditions by the Parole Commissioners.

Some Doe Plaintiffs do present lifetime supervision agreements that contain the 500-foot movement restriction and 1,000-foot residency restriction. There was no language in these agreements ensuring that these conditions would not be applied against someone who was convicted before October 1, 2007. In fact, it was not until the June 2017 Order amending conditions of lifetime supervision was enacted that the Parole Commissioners began stating that these conditions should not be imposed retroactively. In a footnote, the Order provides that the 1,000-foot residency restriction applies to a person who is placed under a program of lifetime supervision before, on, or after October 1, 2007. The Order also provides that the 500-foot movement restriction is to be applied only to convictions occurring on or after February 8, 2013. This Order, signed by both Defendants Corda and Endel, suggests that the residency and movement restrictions were being imposed retroactively to people, such as the Doe Plaintiffs, who were sentenced before October 1, 2007.

Therefore, Doe Plaintiffs with agreements that specifically contain the 500-foot movement restriction, or the 1,000-foot residency restriction, have sufficiently established Defendants Corda and Endel's personal participation in their constitutional violation as they set the conditions that were applied to these offenders retroactively.

***B. Plaintiffs' Emotional Distress Damages***

Each of the Doe Plaintiffs is seeking compensatory damages. "A plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations." Borunda v. Richmond, 885 F.2d 1384, 1389 (9th Cir. 1988). Such damages include "compensation for economic harm, pain and suffering, and mental and emotional distress that results from the violations." Id.; Chalmers v. City of Los L.A., 762 F.2d 753, 760 (9th Cir. 1985) ("The purpose of awarding damages in a section 1983 action is to compensate the aggrieved party."); Memphis Community Sch. Dist. v. Stachura, 477 U.S. 299, 306 (1986) (finding that compensatory damages

"include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation . . . , personal humiliation, and mental anguish and suffering'") (internal quotations omitted).

Damages are not "presumed" in a §1983 claim. Carey v. Piphus, 435 U.S. 247, 253 (1978) (finding no compensatory damages could be awarded for violation of § 1983 right absent proof of actual injury). However, the Ninth Circuit "does not require that damage awards must be supported by 'objective' evidence." Harper v. City of L.A., 533 F.3d 1010, 1030 (9th Cir. 2008) (rejecting defendant's argument that $5,000,001 verdict was excessive because none of the plaintiffs "presented any evidence of specific monetary damages, such as medical expenses or lost income"). "Compensatory damages may be awarded for humiliation and emotional distress established by testimony or inferred from the circumstances, whether or not plaintiffs submit evidence of economic loss or mental or physical symptoms." Tortu v. Las Vegas Metro. Police Dep't, 556 F.3d 1075, 1086 (9th Cir. 2009) (quoting Johnson v. Hale, 13 F.3d 1351, 1352 (9th Cir. 1994)). However, "this does not mean that emotional damages can be inferred entirely from circumstances, without any supporting testimony from witnesses." Harper, 533 F.3d at 1021. Plaintiffs must provide "detailed and substantial testimony" to support their claim(s) for emotional damages. See id.

None of the Doe Plaintiffs submitted documentation for out-of-pocket losses or other economic harms. Instead, they testified to the mental and emotional distress resulting from the constitutional violations. In awarding damages for their emotional distress, the Court considers the testimony of each Plaintiff in turn.[2]

**i. *Terry Green, Doe 16***

Plaintiff Terry Green committed his offense before October 1, 2007. He signed his formalized lifetime supervision agreement on October 16, 2012. He testified that the Division denied his request to live with his wife and daughter upon his release from prison in 2010. Ms.

[2] In making its findings regarding each Plaintiff, the Court's findings distinguish between harm caused by specific application of the 500-foot and 1,000-foot unlawful restrictions versus harm allegedly caused by other conditions which are not challenged here. The Court only awards damages where it finds pursuant to the appropriate standard that the harm was caused by the application of these restrictions. Where the source of the harm was unclear from the evidence, the Court does not award damages to those respective plaintiffs as they have not met their burden.

Wood began her tenure as Chief of the Division on May 5, 2014, after both the imposition of lifetime supervision conditions and the denial of his housing request. Further, had Mr. Green renewed his request to move in with his wife and daughter during Ms. Wood's tenure as Chief of the Division, a denial of any such request would not be related to the 500-foot movement restriction and 1,000-foot residency restriction imposed by SB 271. Another condition of his lifetime supervision stated that he could not have contact with a person less than 18 years of age in a secluded environment unless another adult who has never been convicted of an offense listed in NRS 179D.410 was present. SB 471 did not alter restrictions on living with minor children. Therefore, this harm stems from lifetime supervision conditions other than SB 471's movement and residency restrictions. Additionally, Mr. Green did not testify that the denial of his request to live with this wife and daughter was because they were located within 1,000 feet of a school or another location where children frequented. Therefore, Plaintiff has failed to establish Ms. Wood's personal participation and his claim for money damages against her is denied.

His lifetime supervision agreement states that the Board of Parole Commissioners assigned his conditions. Defendants Corda and Endel were serving as Commissioners at the time this agreement was signed. Condition Number 19 states that he shall not be in or near a playground, school, school grounds, motion picture theatre, or a business primarily for children. However, it does not contain the 500-foot or 1,000-foot restriction that was retroactively imposed by SB 471. Further, Plaintiff Green did not testify that he was told there was a 500-foot movement restriction or 1,000-foot residency restriction. Plaintiff's testimony related to his damages included that his request to live with his wife and child was denied and that he twice violated his lifetime supervision agreement. Plaintiff did not state that his request to live with his wife and daughter was denied due to a 1,000-foot restriction. Additionally, this request was denied by a Parole Officer who worked for the Division. Commissioners Corda and Endel do not oversee the Division. State court documents introduced as exhibits reflect that Plaintiff's violations of lifetime supervision in 2011 and 2015 were related to a number of conditions including: transporting a child under the age of 18; possessing a cellular telephone with internet capabilities; consuming an alcoholic beverage; possessing a pornographic video; failing to attend sex offender counseling; failing to stay at his

residence; failing to abide by a set curfew; and/or failing to pay supervision fees. His violations of lifetime supervision were not related to a 500-foot movement or 1,000-residency restriction, which Plaintiff did not testify were ever applied to him. Therefore, Plaintiff has failed to establish that Defendants Corda or Endel imposed the 500-foot or 1,000-foot restrictions on him or that these restrictions were responsible for any of his harm.

**ii. *Tania Scott (Gates), Doe 26***

Plaintiff Tania Scott committed her offense before October 1, 2007. On November 14, 2011, she signed a lifetime supervision agreement. The harm that she testified to was being unable to leave the state in order to live with her family in Oregon upon her release from prison. Ms. Wood began her tenure as Chief of the Division on May 5, 2014, after both the imposition of lifetime supervision conditions and the denial of her request to move to Oregon. Further, had Ms. Scott renewed her request to move to Oregon to reside with her family during Ms. Wood's tenure as Chief of the Division, a denial of any such request would not be related to the 500-foot movement restriction and 1,000-foot residency restriction imposed by SB 271 and unconstitutionally retroactively applied. SB 471 did not change the policies related to interstate compacts. Therefore, Plaintiff has failed to establish Ms. Wood's personal participation and her claim for money damages against Ms. Wood is denied.

Her lifetime supervision agreement states that the Board of Parole Commissioners assigned her conditions. Defendants Corda and Endel were serving as Commissioners at the time this agreement was signed. Condition Number 19 states that she shall not be in or near a playground, school, school grounds, motion picture theatre, and/or a business primarily for children. However, it does not contain the 500-foot or 1,000-foot restriction that was retroactively imposed by SB 471. Ms. Scott did testify that she was told the 500-foot and 1,000-foot restrictions were to be applied to her by an unnamed parole officer. Defendants Corda and Endel, as Parole Commissioners, do not oversee parole officers. Additionally, Plaintiff did not testify that the 1,000-foot residency restriction is what caused her to struggle to obtain housing. Instead, her testimony related to being unable to travel to Oregon to reside with her family. Therefore, Plaintiff has failed to establish that Defendants Corda or Endel imposed the 500-foot or 1,000-foot restriction on her, or that these

restrictions were responsible for any of her harm.

**iii. *Joshua Crowe, Doe 25***

Plaintiff Joshua Crowe committed his offense before October 1, 2007. On January 3, 2013, he signed a lifetime supervision agreement. Plaintiff sought to live with his mother after his release from prison. This living situation was denied. Ms. Wood began her tenure as Chief of the Division on May 5, 2014, after both the imposition of lifetime supervision conditions and the denial of his request to live with his mother. At a later date, he wanted to move out from living with his mother and live with his child and the mother of his child. He was first told he could not live with them, though the request was ultimately approved. While the temporary denial of this request may have occurred during Ms. Wood's tenure, another condition of his lifetime supervision stated that he could not have contact with a person less than 18 years of age in a secluded environment unless another adult who has never been convicted of an offense listed in NRS 179D.410 was present. SB 471 did not alter restrictions on living with minor children. Additionally, Mr. Green did not testify that the denial of his request to live with his girlfriend and child was because they were located within 1,000 feet of a location where children frequented. Therefore, this denial stems from lifetime supervision conditions other than SB 471's movement and residency restrictions. Mr. Crowe has failed to establish Ms. Wood's personal participation and his claim for money damages against her is denied.

Mr. Crowe's lifetime supervision agreement states that the Board of Parole Commissioners assigned his conditions. Defendants Corda and Endel were serving as Commissioners at the time this agreement was signed. Unlike the other Doe Plaintiff's lifetime supervision agreements, his agreement specifically contained the 500-foot movement and 1,000-foot residency restrictions. The language of the agreement stated that the conditions would only apply to a sex offender who is Tier 3 offender. He was a Tier 1 offender, but he testified that he was still told the restrictions applied to him. Defendants Corda and Endel may not have overseen the parole officer who told him this, but they did set the specific 500-foot and 1,000-foot restrictions in the lifetime supervision agreement. Unlike the prior Doe Plaintiffs, Mr. Crowe testified that his mother's apartment was 1,000 feet from a swimming pool that children would frequent and that this was the

basis for the denial of his request to live with her. He further stated that this request was denied by three unidentified members of the Parole Board. By setting the 1,000-foot residency restriction as a condition of lifetime supervision, Mr. Endel and Mr. Crowe were personally involved in enforcing the condition against Mr. Crowe.

To support his claim for emotional damages, Mr. Crowe testified that his mother had to relocate to another apartment in that complex in order for him to live with her. He testified that the uncertainty around whether he would receive approval for housing imposed stress on him. The Court awards him $5,000.

**iv. *Joseph Defuria, Doe 13***

Plaintiff Joseph Defuria committed his offense before October 1, 2007. Upon the expiration of his probation in 2010, he entered into a lifetime supervision arrangement while still in Arizona. He signed an interstate compact on February 4, 2010. In November 2012, he was placed under the supervision of Pine County in Arizona. He left Arizona in 2018 and moved back to Nevada. He did not recall still being subject to certain conditions once back in Nevada. He was homeless between 2018 and 2019, when he was released from lifetime supervision. Mr. Defuria testified that his lifetime supervision conditions were set in Arizona, and he testified that he did not recall the imposition of such conditions in Nevada. He did not testify to any 500-foot movement restriction or 1,000-foot residency restriction. He did not testify as to any interaction with a Nevada parole officer. He did not testify that his homelessness between 2018 and 2019 was due to a 1,000-foot residency restriction or that any Nevada parole officer denied a request for housing. Mr. Defuria has failed to establish Ms. Wood, Mr. Endel, or Mr. Corda's personal participation and his claim for money damages against them fails.

**v. *Barty Scott, Doe 17***

Plaintiff Barty Scott committed his offense before October 1, 2007. In 2012, he signed a lifetime supervision agreement. He was told he could not be within a thousand feet of locations frequented by minors. As a result, he stated that he could only find seedy weekly motels for two to three years. The conditions of lifetime supervisions were terminated in 2020. Ms. Wood, who was appointed in 2014, was Chief of the Division during a period of time when he was on

supervision. As described above, Ms. Wood, who was responsible for promulgating Division policies, is liable for a *de facto* policy that was applied against offenders, such as Mr. Scott. Mr. Scott testified that it felt demeaning to be living in weekly motels, and he found it difficult to secure housing. The Court awards him $40,000.

His lifetime supervision agreement states that the Board of Parole Commissioners assigned his conditions. Defendants Corda and Endel were serving as Commissioners at the time this agreement was signed. Condition Number 19 states that she shall not be in or near a playground, school, school grounds, motion picture theatre, and/or a business primarily for children. However, it did not contain the 500-foot or 1,000-foot restriction that was retroactively imposed by SB 471. Mr. Scott did testify that he was told the 1,000-foot restriction was to be applied to him, but Defendants Corda and Endel, as Parole Commissioners, do not oversee parole officers. Therefore, Plaintiff has failed to establish that Defendants Corda or Endel imposed the 1,000-foot restriction on him.

**vi. *Dwight Bellard, Doe 12***

Plaintiff Dwight Bellard testified that his offense occurred sometime in 2003 or 2004, which is prior to October 1, 2007. On September 25, 2012, and December 5, 2012, he signed lifetime supervision agreements. He filed appeals of various conditions unrelated to the 500-foot and 1,000-foot restriction in 2012. He also appeared before a Board hearing in October 2012 seeking to go to the movie theatre and to take his dog to the park. This occurred before Ms. Wood's tenure and concerned actions taken by the Parole Commissioners and the Board, which Ms. Wood does not oversee. Therefore, Mr. Bellard's claim for money damages against her is denied.

Mr. Bellard's lifetime supervision agreement states that the Board of Parole Commissioners assigned his conditions. Defendants Corda and Endel were serving as Commissioners at the time this agreement was signed. Unlike other Doe Plaintiff's lifetime supervision agreements, the document he signed on September 25, 2012, specifically contained the 500-foot movement and 1,000-foot residency restrictions. The language of the agreement stated that the conditions would only apply to a sex offender who is Tier 3 offender. He was a Tier 1 or Tier 2 offender, but he testified that he was still told the 1,000-foot resident restriction applied

to him. Defendants Corda and Endel may not have overseen the parole officer(s) who told him this, but they did set the specific 500-foot and 1,000-foot restrictions in his lifetime supervision agreement. Additionally, unlike other Doe Plaintiffs, Mr. Bellard testified that he appeared at a Board hearing challenging the 500-foot movement restriction which prevented him from attending a theatre or going to the park. By setting the 500-foot residency restriction as a condition of lifetime supervision, Mr. Endel and Mr. Corda were personally involved in enforcing the condition against Mr. Bellard. The Court awards Mr. Bellard $5,000.

**vii. *Kristian Prestholm, Doe 7***

Kristian Prestholm committed his offense before October 1, 2007. On November 23, 2010, he signed a lifetime supervision agreement. He testified that sometime around 2009–2010, he was told that he could not go to California to live with his sister because she lived too close to a park. The denial of his housing plan occurred before Ms. Wood was chief. Because the only harm related to the imposition of the 1,000-foot residency restriction was the denial of his plan to live with his sister, he has failed to establish that Ms. Wood was responsible for his injury and his claim for money damages against her is denied.

Mr. Prestholm's lifetime supervision agreement states that the Board of Parole Commissioners assigned his conditions. Defendants Corda and Endel were serving as Commissioners at the time this agreement was signed. He testified that Defendant Corda was at the two parole hearings setting his conditions. The document he signed specifically contained the 500-foot movement and 1,000-foot residency restrictions. Defendants Corda and Endel may not have overseen the Division's implementation of these conditions, but they did set the specific 500-foot and 1,000-foot restrictions in the lifetime supervision agreement and it contained no exception for people convicted before October 1, 2007. Additionally, Defendant Corda appeared at the later hearings where Mr. Prestholm challenged his conditions, including the movement and residency restrictions. By setting the 500-foot and 1,000-foot restrictions as a condition of lifetime supervision, Mr. Endel and Mr. Corda were personally involved in enforcing the condition against Mr. Prestholm. He testified that the conditions impacted his marriage and his parenting. The Court awards Mr. Prestholm $5,000.

**viii. *Frank Burns, Doe 28***

Frank Burns' offense took place before October 1, 2007. He signed a lifetime supervision agreement on February 25, 2015, after Ms. Wood began her tenure as Chief of the Division. He testified that, in 2015 or 2016, he was told by parole officers that he had to stay 500 feet away from a school. As a result, he testified that the restrictions impacted his job as a delivery driver and meant he could not bring his grandchildren to the park or school. Additionally, his special conditions of lifetime supervision included the specific 500-foot and 1,000-foot restrictions which were imposed when Mr. Endel and Mr. Corda were parole commissioners. Since the conditions were set during their tenure and imposed during Ms. Wood's tenure, and these policies impacted his employment and ability to be a grandfather, the Court awards Mr. Burns $10,000.

**ix. *Marco Reid, Doe 3***

Marco Reid committed his offense before October 1, 2007. He testified that he had to move from his house and had a housing request denied for being too close to a park in 2002 and 2003. Defendants Corda, Endel, and Wood were not Parole Commissioners or Chief of the Division at this time. He testified that since being placed back on lifetime supervision in 2014, he has struggled to find employment and housing but did not testify that these difficulties were related to the residency or movement requirements. He also did not testify that he sought to get approval for housing during that time and had any such request denied. He has failed to establish that the residency or movement restrictions in place during Defendants' Corda, Endel, and Wood's tenure were responsible for his injury. His claim for money damages against them fails.

**x. *David Banuelos, Doe 2***

David Banuelos committed his offense before October 1, 2007. He signed his lifetime supervision agreement on December 22, 2010. His harms included being unable to take his son to certain locations and struggling to find housing. His conditions were not removed until 2016. Chief Wood began her tenure in 2014. Mr. Banuelos testified that it was hard to find a decent place to live. But he did not testify that any such housing request was denied by the Division for being too close to a restricted location. He also did not recall a parole officer specifically telling him that residency or movement restrictions applied to him. Since he did not recall specific acts taken by

the Division—such as informing him of the restrictions, denying housing requests, or denying requests to travel to certain locations like Disney Land—he has failed to establish Ms. Wood's personal participation in any alleged harm.

Mr. Banuelo's lifetime supervision agreement states that the Board of Parole Commissioners assigned his conditions. Defendants Corda and Endel were serving as Commissioners at the time this agreement was signed. The document he signed specifically contained the 500-foot movement and 1,000-foot residency restrictions. The language of the agreement stated that the conditions would only apply to a sex offender who was a Tier 3 offender. Defendants Corda and Endel may not have overseen the Division's implementation of these conditions, but they did set the specific 500-foot and 1,000-foot restrictions in his lifetime supervision agreement, and it contained no exception for people convicted before October 1, 2007. By setting the 500-foot and 1,000-foot restrictions as conditions of lifetime supervision, Mr. Endel and Mr. Corda were personally involved in enforcing the conditions against Mr. Banuelos. Mr. Banuelos testified that the conditions caused him stress and his inability to go to certain locations impacted his relationship with his son. The Court awards Mr. Banuelos $30,000.

**xi. *Jerod Updike, Doe 1***

Jerod Updike committed his offense before October 1, 2007. He signed documents related to lifetime supervision on April 24, 2008, and January 5, 2011. The only impact he testified to concerning the movement and residency restrictions was that his request to live with his parents in the fall of 2007 was denied. However, all of this occurred before Ms. Wood became Chief. She was not in charge of the Division when his housing request was denied, and Mr. Updike did not testify that: (a.) anyone from the Division informed him that he could not be within 1,000 feet of a school or (b.) later requests for housing were denied. He has failed to establish Ms. Wood's personal participation in his injury.

His lifetime supervision agreement states that the Board of Parole Commissioners assigned his conditions. Defendants Corda and Endel were serving as Commissioners at the time this agreement was signed. Condition Number 19 states that he shall not be in or near a playground, school, school grounds, motion picture theatre, and/or a business primarily for children. However,

it did not contain the 500-foot or 1,000-foot restrictions that were retroactively imposed by SB 471. Mr. Updike did not testify that anyone from the Division informed him that there was a 1,000-foot restriction and, even if they had, the parole commissioners do not oversee individual parole officers. Therefore, Plaintiff has failed to establish that Defendants Corda or Endel imposed the 1,000-foot restriction on him or that such a restriction was imposed at all.

**xii. *Julian Grijalva, Doe 5***

Julian Grijalva committed his offense before October 1, 2007. On June 25, 2014, he signed a lifetime supervision agreement, and, in late 2014, wanted to move in with his girlfriend. These actions took place during Ms. Wood's tenure. However, Mr. Grijalva did not testify that he was told that the language in the agreement prohibiting him from residing "near" a school meant he could not be within 1,000 feet of a school. At the most, he testified that a parole officer informed him that the same conditions from parole applied and that there was a 500-foot restriction during his parole. He also testified that he did not request to move into his girlfriend's house, but assumed the restriction meant he would be unable to do so because it was too close to a school. However, he did not testify that anyone from the Division actually told him this or denied his request. He also testified that his niece had to move out of his parents' house when he moved in and that he could not attend family gatherings. However, he did not testify that this was the result of the 500-foot movement restriction or 1,000-foot residency restriction. Instead, he testified that the reason he could not attend family gathering was because there were minor children and internet-capable devices at these gatherings. SB 471 did not change conditions preventing offenders from living with minors. Overall, Mr. Grijalva's testimony did not reflect that the Division imposed the 1,000-foot residency restriction on him or denied any housing request. His claim for money damages against Ms. Wood is denied.

His lifetime supervision agreement states that the Board of Parole Commissioners assigned his conditions. Defendants Corda and Endel were serving as Commissioners at the time this agreement was signed. Condition Number 19 states that he shall not be in or near a playground, school, school grounds, motion picture theatre, and/or a business primarily for children. However, it did not contain the 500-foot or 1,000-foot restrictions that were retroactively imposed by SB

471. Therefore, Mr. Grijalva has failed to establish that Defendants Corda or Endel imposed the restriction(s) on him.

**xiii. *Mario Jetton, Doe 22***

Plaintiff Mario Jetton committed his offense prior to October 1, 2007. He signed his lifetime supervision agreement on August 13, 2010, and testified that between 2010 and 2016 he struggled to find stable housing. Ms. Wood, who was appointed in 2014, was Chief of the Division while Mr. Jetton was under supervision and failed to find adequate housing. Mr. Jetton testified that parole officers denied his various requests to reside at certain locations. As described above, Ms. Wood, who was responsible for promulgating Division policies, is liable for a *de facto* policy that was applied against offenders, such as Mr. Jetton. Mr. Jetton testified that the inability to find regular housing impacted his mental wellbeing. The Court awards him $20,000.

His lifetime supervision agreement states that the Board of Parole Commissioners assigned his conditions. Defendants Corda and Endel were serving as Commissioners at the time this agreement was signed. Condition Number 19 states that he shall not be in or near a playground, school, school grounds, motion picture theatre, or a business primarily for children. However, it did not contain the 500-foot or 1,000-foot restrictions that were retroactively imposed by SB 471. Mr. Jetton did testify that he was told a 500 or 1,000-foot restriction applied, but Defendants Corda and Endel, as parole commissioners, do not oversee parole officers. Therefore, Plaintiff has failed to establish that Defendants Corda or Endel imposed the restriction on him.

**xiv. *Ruben Diaz, Doe 27***

Plaintiff Ruben Diaz committed his offense before October 1, 2007. His lifetime supervision agreement was signed on August 15, 2010. In 2013, he submitted a request to move to a new location and was rejected by an Officer Woodbury with the Division. He asked to move to a different apartment a few months later and was denied. Chief Wood was not in charge of the Division during this period. She was in charge in 2017, when he was released from prison and presented with an order amending his conditions of lifetime supervision, but Mr. Diaz did not testify to any denial of housing requests that occurred after this period. Since Ms. Wood was not in charge of the Division during the various denials of his housing requests, Mr. Diaz's claim for

money damages against her is denied.

Mr. Diaz's lifetime supervision agreement states that the Board of Parole Commissioners assigned his conditions. Defendants Corda and Endel were serving as Commissioners at the time this agreement was signed. An amendment of his lifetime supervision agreement dated March 2, 2009, contained the 500-foot movement restriction. However, it did not contain the 1,000-foot residency restriction. He stated that he had two housing requests denied by parole officers, but Defendants Corda and Endel do not oversee them. An order amending his conditions of lifetime supervision, dated June 19, 2017, contained both the 500-foot and 1,000-foot restrictions. These conditions only applied to Tier 3 offenders, but Mr. Diaz testified that he was elevated to a Tier 3 offender in 2013. Therefore, as of 2017, Defendants Corda and Endel had imposed a 1,000-foot residency restriction, but Mr. Diaz did not testify to any attempts to find housing or housing denials after this date. Since Mr. Corda and Mr. Endel did not impose a 1,000-foot restriction at the time that Mr. Diaz's housing requests were denied, his claim for money damages against them is denied.

**xv. *Eddie Ridenour, Doe 31***

Eddie Ridenour recalled that his offense occurred in 2005, which is before October 1, 2007. He was told to write his name on a lifetime supervision understanding on September 2, 2017. Ms. Wood was Chief during this period. He testified that sometime in 2018, he was told by a Washington state supervisor that he could reside at a house. The denial occurred in Washington following an interstate compact with Nevada. Ms. Wood is not liable for this denial by Washington state officials. In May 2020, Mr. Ridenour had a request to move to a house denied by a Nevada parole officer. He also testified that the requirements were an imposition because his children and grandchildren would primarily be associated with places he was not allowed to be near due to the movement restriction. Ms. Wood was responsible for promulgating policies that resulted in a *de facto* policy of enforcing these conditions against offenders, such as Mr. Ridenour, that resulted in the denial of his housing request and his inability to be near certain locations. The Court awards him $20,000.

Unlike other Plaintiffs' lifetime supervision agreements, Mr. Ridenour's lifetime supervision understanding does not state that the Board of Parole Commissioners assigned his

conditions. In fact, it references that a condition may be enforced if the "Chief" deems it necessary. Plaintiff has not established Defendants Corda and Endel's involvement, as he testified that he was informed of the distance requirements by various parole officers. Based solely off the lifetime supervision understanding, which does not reference either Defendant Endel, Defendant Corda, or the parole commissioners, the Court does not find that they are liable for the denial of his housing request.

**xvi. *Donald White, Doe 32***

Donald White's offense took place before October 1, 2007. In October 2016, Officer Gallagher informed him that he had to move because he was located too close to a school. As described above, Ms. Wood, who was responsible for promulgating Division policies, is liable for a *de facto* policy that was applied against offenders, such as Mr. White. The Court awards him $10,000.

His order setting conditions of lifetime supervision was signed by Defendant Endel and approved by Defendant Corda. A condition states that he shall not be in or near a playground, school, school grounds, motion picture theatre, or a business primarily for children. However, it does not contain the 500-foot or 1,000-foot restriction that was retroactively imposed by SB 471. Mr. White did testify that he was told by Officer Gallagher that the 1,000-foot restriction was to be applied to him, but Defendants Corda and Endel, as parole commissioners, do not oversee parole officers. Therefore, Plaintiff has failed to establish that Defendants Corda or Endel imposed the 1,000-foot restriction on him.

**xvii. *George Rosenthal, Doe 18***

Plaintiff George Rosenthal committed his offense before October 1, 2007. He signed his lifetime supervision agreement on June 26, 2012. In 2012, he sought to move in with his girlfriend, but he was told she lived too close to a school. Both his placement on lifetime supervision and this denial occurred before Ms. Wood became Division Chief, and, therefore, she is not liable for these episodes. But they are not the only ones. In 2015, after Mr. Rosenthal was separated from his wife, he tried to move into a town home in Green Valley; but this move was denied by a parole officer because the home was too close to a school. He also testified that he could not pick his son up from

day care, the park, or soccer because of his movement and/or residency restrictions. These episodes took place during Ms. Wood's tenure. While it was a parole officer that denied his request to live at a certain location, Ms. Wood was responsible, as Chief, for establishing the relevant Division policies that resulted in the imposition of the restrictions against him. He testified that these conditions destroyed his marriage and caused him to attempt suicide. The Court awards him $100,000.

Mr. Rosenthal's lifetime supervision agreement states that the Board of Parole Commissioners assigned his conditions. Defendants Corda and Endel were serving as Commissioners at the time this agreement was signed. Condition Number 19 states that he shall not be in or near a playground, school, school grounds, motion picture theatre, and/or a business primarily for children. However, it does not contain the 500-foot or 1,000-foot restriction that was retroactively imposed by SB 471. He was informed that he was subject to these restrictions and he was denied the ability to move to certain locations, but these actions were taken by individual parole officers. Parole commissioners do not oversee parole officers. Therefore, Mr. Rosenthal is not entitled to damages from Defendants Corda or Endel.

**xviii. *Gonzales Ramos Lopez, Doe 30***

Plaintiff Gonzales Lopez testified that his offense occurred between 2011 and 2013. The Court finds, based on Plaintiff's own testimony, that the offense did not occur before October 1, 2007. Therefore, the conditions imposed by SB 471 were not applied retroactively, and he is not entitled to money damages.

**xix. *Eric Zaqueo Archuleta, Doe 16***

Plaintiff Eric Archuleta committed his offense before October 1, 2007. He testified that he was placed on lifetime supervision in 2007. Plaintiff also submitted a Board of Parole Commissioners Worksheet for Lifetime Supervision for Sex Offenders that has Plaintiff's name and is dated February 26, 2013. He testified that, starting in 2010 with the birth of his son, he was unable to attend parties with him at the park or take him to school. Mr. Archuleta did not testify as to whether he remains on lifetime supervision. Mr. Archuleta did not provide testimony on the application of the unlawful restrictions to him, so he fails to meet his burden as to any defendant.

**xx. *John Kanipe, Doe 21***

Plaintiff John Kanipe committed his offense before October 1, 2007. A lifetime supervision agreement with Plaintiff's name states that it was activated on February 3, 2005. The document states that it was amended on November 20, 2012, to exclude the requirement that he not be in or near these locations as the victim was an adult. Ms. Wood began her tenure as Chief of the Division on May 5, 2014, after both the imposition of lifetime supervision conditions and the amendment of his conditions wherein any residency requirement was no longer imposed against him. Therefore, Plaintiff has failed to establish Ms. Wood's personal participation, and his claim for money damages against her is denied.

His lifetime supervision agreement states that the Board of Parole Commissioners assigned his conditions. Defendants Corda and Endel were serving as Commissioners at the time this agreement was signed. Condition Number 19 states that he shall not be in or near a playground, school, school grounds, motion picture theatre, or a business primarily for children. However, it does not contain the 500-foot or 1,000-foot restrictions that were retroactively imposed by SB 471. Additionally, unlike the agreements provided by other Doe Plaintiffs, it explicitly states that this condition is "excluded." Mr. Kanipe testified that he was told he had to be 500 or 1,000 feet from schools. But he did not recall the name of the officer who told him this, nor the date on which the conversation took place. Further, while Mr. Kanipe testified that he suffered harm because he could not take his children to school functions, Plaintiff did not explain who restricted him from doing so, nor the dates on which he was told about this restriction. Defendants Corda and Endel, as parole commissioners, do not oversee parole officers. Mr. Kanipe does provide a letter from a Management Analysis with the Nevada Board of Parole Commissioners adding new conditions as of January 1, 2021, but these conditions similarly do not include any movement or residency restrictions. Therefore, Plaintiff has failed to establish Mr. Corda and Mr. Endel's personal participation, and his claim for money damages against them is denied.

///

///

///

## IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** Plaintiff Terry Green's claim for money damages against Defendants Wood, Endel, and Corda is **DENIED**.

**IT IS FURTHER ORDERED** Plaintiff Tania Scott's claim for money damages against Defendants Wood, Endel, and Corda is **DENIED**.

**IT IS FURTHER ORDERED** Plaintiff Joshua Crowe's claim for money damages against Defendant Wood is **DENIED**. His claim for money damages against Defendants Endel and Corda is **GRANTED**. He is awarded $5,000.

**IT IS FURTHER ORDERED** Plaintiff Joseph Defuria's claim for money damages against Defendants Wood, Endel, and Corda is **DENIED**.

**IT IS FURTHER ORDERED** Plaintiff Barty Scott's claim for money damages against Defendants Endel and Corda is **DENIED**. His claim for money damages against Defendant Wood is **GRANTED**. He is awarded $40,000.

**IT IS FURTHER ORDERED** Plaintiff Dwight Bellard's claim for money damages against Defendant Wood is **DENIED**. His claim for money damages against Defendants Endel and Corda is **GRANTED**. He is awarded $5,000.

**IT IS FURTHER ORDERED** Plaintiff Kristian Prestholm's claim for money damages against Defendant Wood is **DENIED**. His claim for money damages against Defendants Endel and Corda is **GRANTED**. He is awarded $5,000.

**IT IS FURTHER ORDERED** Plaintiff Frank Burns' claim for money damages against Defendants Wood, Endel, and Corda is **GRANTED**. He is awarded $10,000.

**IT IS FURTHER ORDERED** Plaintiff Marco Reid's claim for money damages against Defendants Wood, Endel, and Corda is **DENIED**.

**IT IS FURTHER ORDERED** Plaintiff David Banuelos' claim for money damages against Defendant Wood is **DENIED**. His claim for money damages against Defendants Endel and Corda is **GRANTED**. He is awarded $30,000.

**IT IS FURTHER ORDERED** Plaintiff Jerod Updike's claim for money damages against Defendants Wood, Endel, and Corda is **DENIED**.

**IT IS FURTHER ORDERED** Plaintiff Julian Grijalva's claim for money damages against Defendants Wood, Endel, and Corda is **DENIED**.

**IT IS FURTHER ORDERED** Plaintiff Mario Jetton's claim for money damages against Defendants Endel and Corda is **DENIED**. His claim for money damages against Defendant Wood is **GRANTED**. He is awarded $20,000.

**IT IS FURTHER ORDERED** Plaintiff Ruben Diaz's claim for money damages against Defendants Wood, Endel, and Corda is **DENIED**.

**IT IS FURTHER ORDERED** Plaintiff Eddie Ridenour's claim for money damages against Defendants Endel and Corda is **DENIED**. His claim for money damages against Defendant Wood is **GRANTED**. He is awarded $20,000.

**IT IS FURTHER ORDERED** Plaintiff Donald White's claim for money damages against Defendants Endel and Corda is **DENIED**. His claim for money damages against Defendant Wood is **GRANTED**. He is awarded $10,000.

**IT IS FURTHER ORDERED** Plaintiff George Rosenthal's claim for money damages against Defendants Endel and Corda is **DENIED**. His claim for money damages against Defendant Wood is **GRANTED**. He is awarded $100,000.

**IT IS FURTHER ORDERED** Plaintiff Ramos Lopez's claim for money damages against Defendants Wood, Endel, and Corda is **DENIED**.

**IT IS FURTHER ORDERED** Plaintiff Eric Zaqueo Archuleta's claim for money damages against Defendants Wooed, Endel, and Corda is **DENIED**.

**IT IS FURTHER ORDERED** Plaintiff John Kanipe's claim for money damages against Defendants Wood, Endel, and Corda is **DENIED**.

The Clerk of Court is kindly instructed to enter judgment accordingly and close this case.

**DATED:** August 14, 2026.

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**